# BRAY ET AL. *v.* ALEXANDRIA WOMEN'S HEALTH CLINIC ET AL.

No. 90–985.   Argued October 16, 1991—Reargued October 6, 1992—
Decided January 13, 1993

264

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 287. SOUTER, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 288. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 307. O'CONNOR, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 345.

*Jay Alan Sekulow* reargued the cause for petitioners. With him on the briefs were *James M. Henderson, Sr., Douglas W. Davis, Thomas Patrick Monaghan, Walter M. Weber,* and *James E. Murphy.*

*Deputy Solicitor General Roberts* reargued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Paul J. Larkin, Jr., Barbara L. Herwig,* and *Lowell V. Sturgill, Jr.*

*Deborah A. Ellis* reargued the cause for respondents. With her on the brief were *Martha F. Davis, Sally F. Goldfarb, John H. Schafer,* and *Laurence J. Eisenstein.* Mr. Schafer argued the cause for respondents on the original argument. With him on the brief were *William H. Allen,* Mr. Eisenstein, *Alison Wetherfield,* and *Helen Neuborne.**

---

*Briefs of *amici curiae* urging reversal were filed for American Victims of Abortion by *James Bopp, Jr.,* and *Richard E. Coleson;* for Concerned Women for America by *Andrew J. Ekonomou* and *Mark N. Troobnick;* for Feminists for Life of America et al. by *Christine Smith Torre* and *Edward R. Grant;* for the Free Congress Foundation by *Eric A. Daly* and *Jordan Lorence;* for The Rutherford Institute et al. by *John W. Whitehead, Joseph P. Secola,* and *George J. Mercer;* for the Southern Center for Law & Ethics by *Albert L. Jordan;* for Woman Exploited by Abortion et al. by *Samuel Brown Casey, Victor L. Smith,* and *David L. Llewellyn;* for Daniel Berri-

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether the first clause of Rev. Stat. § 1980, 42 U. S. C. § 1985(3)—the surviving version of § 2 of the Civil Rights Act of 1871—provides a federal cause of action against persons obstructing access to abortion clinics. Respondents are clinics that perform abortions and organizations that support legalized abortion and that have members who may wish to use abortion clinics. Petitioners are Operation Rescue, an unincorporated association whose members oppose abortion, and six individuals. Among its activities, Operation Rescue organizes antiabortion demonstrations in which participants trespass on, and obstruct general access to, the premises of abortion clinics. The individual petitioners organize and coordinate these demonstrations.

Respondents sued to enjoin petitioners from conducting demonstrations at abortion clinics in the Washington, D. C., metropolitan area. Following an expedited trial, the District Court ruled that petitioners had violated § 1985(3) by

gan et al. by *Wendall R. Bird* and *David J. Myers;* and for *James Joseph Lynch, Jr., pro se.*

Briefs of *amici curiae* urging affirmance were filed for the Attorney General of New York et al. by *Robert Abrams,* Attorney General of New York, *pro se, O. Peter Sherwood,* Solicitor General, *Sanford M. Cohen* and *Shelley B. Mayer,* Assistant Attorneys General, and *Mary Sue Terry,* Attorney General of Virginia, *pro se;* for the American Civil Liberties Union et al. by *Judith Levin, Steven R. Shapiro, John A. Powell, Burt Neuborne,* and *Elliot M. Mincberg;* for Falls Church, Virginia, by *David R. Lasso;* for the NAACP Legal Defense and Educational Fund, Inc., by *Julius L. Chambers, Charles Stephen Ralston,* and *Eric Schnapper;* for the National Abortion Federation et al. by *Elaine Metlin, Roger K. Evans,* and *Eve W. Paul;* and for 29 Organizations Committed to Women's Health and Women's Equality by *Dawn Johnsen, Lois Eisner Murphy,* and *Marcy J. Wilder.*

Briefs of *amici curiae* were filed for the National Right to Life Committee, Inc., et al. by *James Bopp, Jr.,* and *Barry A. Bostrom;* and for George Lucas et al. by *Lawrence J. Joyce* and *Craig H. Greenwood.*

conspiring to deprive women seeking abortions of their right to interstate travel. The court also ruled for respondents on their pendent state-law claims of trespass and public nuisance. As relief on these three claims, the court enjoined petitioners from trespassing on, or obstructing access to, abortion clinics in specified Virginia counties and cities in the Washington, D. C., metropolitan area. *National Organization for Women* v. *Operation Rescue,* 726 F. Supp. 1483 (ED Va. 1989). Based on its § 1985(3) ruling and pursuant to 42 U. S. C. § 1988, the court also ordered petitioners to pay respondents $27,687.55 in attorney's fees and costs.

The Court of Appeals for the Fourth Circuit affirmed, *National Organization for Women* v. *Operation Rescue,* 914 F. 2d 582 (1990), and we granted certiorari, 498 U. S. 1119 (1991). The case was argued in the October 1991 Term, and pursuant to our direction, see 504 U. S. 970 (1992), was reargued in the current Term.

## I

Our precedents establish that in order to prove a private conspiracy in violation of the first clause of § 1985(3),[1] a plain-

---

[1] Section 1985(3) provides as follows:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United

tiff must show, *inter alia*, (1) that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," *Griffin* v. *Brecken-ridge*, 403 U. S. 88, 102 (1971), and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment," *Carpenters* v. *Scott*, 463 U. S. 825, 833 (1983). We think neither showing has been made in the present case.

## A

In *Griffin* this Court held, reversing a 20-year-old precedent, see *Collins* v. *Hardyman*, 341 U. S. 651 (1951), that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies. In finding that the text required that expanded scope, however, we recognized the "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law." *Griffin*, 403 U. S., at 102. That was to be avoided, we said, "by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment," *ibid.*—citing specifically Representative Shellabarger's statement that the law was restricted "'to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies . . . ,'" *id.*, at 100 (emphasis in original), quoting Cong. Globe, 42d Cong., 1st Sess., App. 478 (1871). We said that "[t]he language [of § 1985(3)] requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously

States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U. S. C. § 1985(3).

discriminatory animus behind the conspirators' action." 403 U. S., at 102 (emphasis in original).

We have not yet had occasion to resolve the "perhaps"; only in *Griffin* itself have we addressed and upheld a claim under § 1985(3), and that case involved race discrimination. Respondents assert that there qualifies alongside race discrimination, as an "otherwise class-based, invidiously discriminatory animus" covered by the 1871 law, opposition to abortion. Neither common sense nor our precedents support this.

To begin with, we reject the apparent conclusion of the District Court (which respondents make no effort to defend) that opposition to abortion constitutes discrimination against the "class" of "women seeking abortion." Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid. *Ibid.* As JUSTICE BLACKMUN has cogently put it, the class "cannot be defined simply as the group of victims of the tortious action." *Carpenters, supra,* at 850 (dissenting opinion). "Women seeking abortion" is not a qualifying class.

Respondents' contention, however, is that the alleged class-based discrimination is directed not at "women seeking abortion" but at women in general. We find it unnecessary to decide whether *that* is a qualifying class under § 1985(3), since the claim that petitioners' opposition to abortion reflects an animus against women in general must be rejected. We do not think that the "animus" requirement can be met

only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination against women. It does demand, however, at least a purpose that focuses upon women *by reason of their sex*—for example (to use an illustration of assertedly benign discrimination), the purpose of "saving" women *because they are women* from a combative, aggressive profession such as the practice of law. The record in this case does not indicate that petitioners' demonstrations are motivated by a purpose (malevolent *or* benign) directed specifically at women as a class; to the contrary, the District Court found that petitioners define their "rescues" not with reference to women, but as physical intervention "'between abortionists and the innocent victims,'" and that "all [petitioners] share a deep commitment to the goals of stopping the practice of abortion and reversing its legalization." 726 F. Supp., at 1488. Given this record, respondents' contention that a class-based animus has been established can be true only if one of two suggested propositions is true: (1) that opposition to abortion can reasonably be presumed to reflect a sex-based intent, or (2) that intent is irrelevant, and a class-based animus can be determined solely by effect. Neither proposition is supportable.

As to the first: Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue, just as men and women are on both sides of petitioners' unlawful demonstrations.

See *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 850 (1992).

Respondents' case comes down, then, to the proposition that intent is legally irrelevant; that since voluntary abortion is an activity engaged in only by women,[2] to disfavor it is *ipso facto* to discriminate invidiously against women as a class. Our cases do not support that proposition. In *Geduldig* v. *Aiello,* 417 U. S. 484 (1974), we rejected the claim that a state disability insurance system that denied coverage to certain disabilities resulting from pregnancy discriminated on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. "While it is true," we said, "that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.,* at 496, n. 20. We reached a similar conclusion in *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256 (1979), sustaining against an Equal Protection Clause challenge a Massachusetts law giving employment preference to military veterans, a class which in Massachusetts was over 98% male, *id.,* at 270. " 'Discriminatory purpose,' " we said, "implies more than intent as volition or intent as awareness of consequences. It

---

[2] Petitioners and their *amici* argue that the intentional destruction of human fetuses, which is the target of their protests, is engaged in not merely by the women who seek and receive abortions, but by the medical and support personnel who provide abortions, and even by the friends and relatives who escort the women to and from the clinics. Many of those in the latter categories, petitioners point out, are men, and petitioners block their entry to the clinics no less than the entry of pregnant women. Respondents reply that the essential object of petitioners' conspiracy is to prevent women from intentionally aborting their fetuses. The fact that the physical obstruction targets some men, they say, does not render it any less "class based" against women—just as a racial conspiracy against blacks does not lose that character when it targets in addition white supporters of black rights, see *Carpenters* v. *Scott,* 463 U. S. 825, 836 (1983). We need not resolve this dispute, but assume for the sake of argument that respondents' characterization is correct.

implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*, at 279 (citation omitted).[3] The same principle applies to the "class-based, invidiously discriminatory animus" requirement of § 1985(3).[4] Moreover, two of our cases

---

[3] JUSTICE STEVENS asserts that, irrespective of intent or motivation, a classification is sex based if it has a sexually discriminatory effect. *Post*, at 326–332. The cases he puts forward to confirm this revisionist reading of *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), in fact confirm the opposite. *Nashville Gas Co.* v. *Satty*, 434 U. S. 136 (1977), cited *Geduldig* only once, in *endorsement* of *Geduldig's* ruling that a facially neutral benefit plan is not sex based unless it is shown that "'distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other.'" 434 U. S., at 145 (quoting *Geduldig, supra*, at 496–497, n. 20) (internal quotation marks omitted). *Satty* said that the Court "need not decide" whether "it is necessary to prove intent to establish a prima facie violation of § 703(a)(1)," 434 U. S., at 144, because "[r]espondent failed to prove *even* a discriminatory *effect*," *id.*, at 145 (emphasis added). It is clear from this that sex-based discriminatory intent is something beyond sexually discriminatory effect. The Court found liability in *Satty* "[n]otwithstanding *Geduldig*," *post*, at 328, *not* (as JUSTICE STEVENS suggests) because *Geduldig* is compatible with the belief that effects alone constitute the requisite intent, but rather because § 703(a)(2) of Title VII *has no intent requirement*, 434 U. S., at 139–141. In his discussion of the (inapplicable) Pregnancy Discrimination Act, 92 Stat. 2076, JUSTICE STEVENS acknowledges that *Congress* understood *Geduldig* as we do, see *post*, at 330–331, and nn. 29–30. As for the cases JUSTICE STEVENS relegates to footnotes: *Turner* v. *Utah Dept. of Employment Security*, 423 U. S. 44 (1975), was not even a discrimination case; *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 135 (1976), describes the holding of *Geduldig* precisely as we do; and *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669 (1983), casts no doubt on the continuing vitality of *Geduldig*.

[4] We think this principle applicable to § 1985(3) *not* because we believe that Equal Protection Clause jurisprudence is automatically incorporated into § 1985(3), but rather because it is inherent in the requirement of a class-based animus, *i. e.*, an *animus based on class*. We do not dispute JUSTICE STEVENS' observation, *post*, at 326, that Congress "may offer relief from discriminatory effects," without evidence of intent. The question is

deal specifically with the disfavoring of abortion, and establish conclusively that it is not *ipso facto* sex discrimination. In *Maher* v. *Roe*, 432 U. S. 464 (1977), and *Harris* v. *McRae*, 448 U. S. 297 (1980), we held that the constitutional test applicable to government abortion-funding restrictions is not the heightened-scrutiny standard that our cases demand for sex-based discrimination, see *Craig* v. *Boren*, 429 U. S. 190, 197–199 (1976), but the ordinary rationality standard. See *Maher, supra,* at 470–471, 478; *Harris, supra,* at 322–324.

---

whether it has done so, and if we are faithful to our precedents we must conclude that it has not.

JUSTICE STEVENS and JUSTICE O'CONNOR would replace discriminatory purpose with a requirement of intentionally class-specific (or perhaps merely disparate) impact. *Post,* at 322–332 (STEVENS, J., dissenting); *post,* at 350–354 (O'CONNOR, J., dissenting). It is enough for these dissenters that members of a protected class are "targeted" for unlawful action "by virtue of their class characteristics," *post,* at 352 (O'CONNOR, J., dissenting), see also *post,* at 354, regardless of what the motivation or animus underlying that unlawful action might be. Accord, *post,* at 322–323 (STEVENS, J., dissenting). This approach completely eradicates the distinction, apparent in the statute itself, between purpose and effect. Under JUSTICE STEVENS' approach, petitioners' admitted purpose of preserving fetal life (a "*legitimate and nondiscriminatory goal,*" *post,* at 323 (emphasis added)) becomes the "*indirect consequence* of petitioners' blockade," while the discriminatory effect on women seeking abortions is now "the conspirators' *immediate purpose,*" *ibid.* (emphasis added). JUSTICE O'CONNOR acknowledges that petitioners' "target[ing]" is motivated by "opposition to the practice of abortion." *Post,* at 351.

In any event, the characteristic that formed the basis of the targeting here was not womanhood, but the seeking of abortion—so that the class the dissenters identify is the one we have rejected earlier: women seeking abortion. The approach of equating opposition to an activity (abortion) that can be engaged in only by a certain class (women) with opposition to that class leads to absurd conclusions. On that analysis, men and women who regard rape with revulsion harbor an invidious antimale animus. Thus, if state law should provide that convicted rapists must be paroled so long as they attend weekly counseling sessions; and if persons opposed to such lenient treatment should demonstrate their opposition by impeding access to the counseling centers; those protesters would, on the dissenters' approach, be liable under § 1985(3) because of their antimale animus.

The nature of the "invidiously discriminatory animus" *Griffin* had in mind is suggested both by the language used in that phrase ("invidious . . . [t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating," Webster's Second International Dictionary 1306 (1954)) and by the company in which the phrase is found ("there must be *some racial, or perhaps otherwise class-based*, invidiously discriminatory animus," *Griffin*, 403 U. S., at 102 (emphasis added)). Whether one agrees or disagrees with the goal of preventing abortion, that goal in itself (apart from the use of unlawful means to achieve it, which is not relevant to our discussion of animus) does not remotely qualify for such harsh description, and for such derogatory association with racism. To the contrary, we have said that "a value judgment favoring childbirth over abortion" is proper and reasonable enough to be implemented by the allocation of public funds, see *Maher, supra,* at 474, and Congress itself has, with our approval, discriminated against abortion in its provision of financial support for medical procedures, see *Harris, supra,* at 325. This is not the stuff out of which a § 1985(3) "invidiously discriminatory animus" is created.

## B

Respondents' federal claim fails for a second, independent reason: A § 1985(3) private conspiracy "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," requires an intent to deprive persons of a right guaranteed against private impairment. See *Carpenters*, 463 U. S., at 833. No intent to deprive of such a right was established here.

Respondents, like the courts below, rely upon the right to interstate travel—which we have held to be, in at least some contexts, a right constitutionally protected against private interference. See *Griffin, supra,* at 105–106. But all that respondents can point to by way of connecting petitioners'

actions with that particular right is the District Court's finding that "[s]ubstantial numbers of women seeking the services of [abortion] clinics in the Washington Metropolitan area travel interstate to reach the clinics." 726 F. Supp., at 1489. That is not enough. As we said in a case involving 18 U. S. C. § 241, the criminal counterpart of § 1985(3):

> "[A] conspiracy to rob an interstate traveler would not, of itself, violate § 241. But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then . . . the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought." *United States* v. *Guest*, 383 U. S. 745, 760 (1966).[5]

Our discussion in *Carpenters* makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be *"aimed at,"* 463 U. S., at 833 (emphasis added); its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects

---

[5] JUSTICE STEVENS finds "most significant . . . the dramatic difference between the language of 18 U. S. C. § 241" and that of § 1985(3), in that the former "includes an unequivocal 'intent' requirement." *Post*, at 335. He has it precisely backwards. The *second* paragraph of § 241 does contain an explicit "intent" requirement, but the *first* paragraph, which was the only one at issue in *Guest*, see 383 U. S., at 747, does not; whereas § 1985(3) does explicitly require a "purpose." As for JUSTICE STEVENS' emphasis upon the fact that § 1985(3), unlike § 241, embraces "a purpose to deprive another of a protected privilege 'either directly or indirectly,'" *post*, at 335: that in no way contradicts a specific intent requirement. The phrase "either directly or indirectly" modifies "depriving," not "purpose." The deprivation, whether direct or indirect, must still have been the *purpose* of the defendant's action.

upon an identifiable group," *Feeney,* 442 U. S., at 279, so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.[6] That was not shown to be the case here, and is on its face implausible. Petitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel.

Respondents have failed to show a conspiracy to violate the right of interstate travel for yet another reason: Petitioners' proposed demonstrations would not implicate that right. The federal guarantee of interstate travel does not transform state-law torts into federal offenses when they are intention-

---

[6] To contradict the plain import of our cases on this point, JUSTICE STEVENS presses into service a footnote in *Griffin. Post,* at 335–336, n. 33. In addressing "[t]he motivation requirement introduced by the word 'equal' into . . . § 1985(3)," *Griffin* said that *this* was not to be confused with a test of "specific intent to deprive a person of a federal right made definite by decision or other rule of law"; § 1985(3) "contains no specific requirement of 'wilfulness,'" and its "motivation aspect . . . focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus." *Griffin,* 403 U. S., at 102, n. 10. This is supremely irrelevant to the present discussion, since (1) we are not considering "the motivation requirement introduced by the word 'equal,'" but rather the intent requirement introduced by the word "purpose," and (2) we are not asserting that the right in question must have been "made definite by decision or other rule of law," but only that it must have been "*aimed at,*" with or without knowledge that it is a federally protected right, cf. *Screws* v. *United States,* 325 U. S. 91, 103–107 (1945)—a requirement not of "wilfulness," in other words, but only of "purpose." The requisite "purpose" was of course pleaded in *Griffin,* as we specifically noted. See 403 U. S., at 103. JUSTICE STEVENS makes no response whatever to the plain language of *Carpenters,* except to contend that the same irrelevant footnote 10 reaches forward 12 years in time, to prevent *Carpenters* from meaning what it obviously says *("aimed at")*. Although a few lower courts at one time read the *Griffin* footnote as JUSTICE STEVENS does, see *post,* at 336–337, those cases were all decided years before this Court's opinion in *Carpenters,* which we follow.

ally committed against interstate travelers. Rather, it protects interstate travelers against two sets of burdens: "the erection of actual barriers to interstate movement" and "being treated differently" from intrastate travelers. *Zobel* v. *Williams*, 457 U. S. 55, 60, n. 6 (1982). See *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869) (Art. IV, § 2, "inhibits discriminating legislation against [citizens of other States and] gives them the right of free ingress into other States, and egress from them"); *Toomer* v. *Witsell*, 334 U. S. 385, 395 (1948) (Art. IV, § 2, "insure[s] to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy"). As far as appears from this record, the only "actual barriers to . . . movement" that would have resulted from petitioners' proposed demonstrations would have been in the immediate vicinity of the abortion clinics, restricting movement from one portion of the Commonwealth of Virginia to another. Such a purely intrastate restriction does not implicate the right of interstate travel, even if it is applied intentionally against travelers from other States, unless it is applied *discriminatorily* against them. That would not be the case here, as respondents conceded at oral argument.[7]

The other right alleged by respondents to have been intentionally infringed is the right to abortion. The District Court declined to rule on this contention, relying exclusively upon the right-of-interstate-travel theory; in our view it also

---

[7]JUSTICE STEVENS expresses incredulity at the rule we have described. It is, he says, "unsupported by precedent or reason," *post*, at 333, both of which show, he claims, that the right of interstate travel is violated even by "conduct that evenhandedly disrupts both local and interstate travel," *post*, at 337. We cite right-to-travel cases for our position; he cites nothing but negative Commerce Clause cases for his. While it is always pleasant to greet such old Commerce Clause warhorses as *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), *Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951), and *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761 (1945), cited *post*, at 337, surely they are irrelevant to the individual right of interstate travel we are here discussing. That right does not derive from the negative Commerce Clause, or else it could be eliminated by Congress.

is an inadequate basis for respondents' § 1985(3) claim. Whereas, unlike the right of interstate travel, the asserted right to abortion was assuredly "aimed at" by the petitioners, deprivation of that federal right (whatever its contours) cannot be the object of a purely private conspiracy. In *Carpenters*, we rejected a claim that an alleged private conspiracy to infringe First Amendment rights violated § 1985(3). The statute does not apply, we said, to private conspiracies that are "aimed at a right that is by definition a right only against state interference," but applies only to such conspiracies as are "aimed at interfering with rights . . . protected against private, as well as official, encroachment." 463 U. S., at 833. There are few such rights (we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude, *United States* v. *Kozminski*, 487 U. S. 931, 942 (1988), and, in the same Thirteenth Amendment context, the right of interstate travel, see *United States* v. *Guest*, 383 U. S., at 759, n. 17). The right to abortion is not among them. It would be most peculiar to accord it that preferred position, since it is much less explicitly protected by the Constitution than, for example, the right of free speech rejected for such status in *Carpenters*. Moreover, the right to abortion has been described in our opinions as one element of a more general right of privacy, see *Roe* v. *Wade*, 410 U. S. 113, 152–153 (1973), or of Fourteenth Amendment liberty, see *Planned Parenthood of Southeastern Pa.*, 505 U. S., at 846–851; and the other elements of those more general rights are obviously *not* protected against private infringement. (A burglar does not violate the Fourth Amendment, for example, nor does a mugger violate the Fourteenth.) Respondents' § 1985(3) "deprivation" claim must fail, then, because they have identified no right protected against private action that has been the object of the alleged conspiracy.

## II

Two of the dissenters claim that respondents have established a violation of the second, "hindrance" clause of § 1985(3), which covers conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." 42 U. S. C. § 1985(3).

This "claim" could hardly be presented in a posture less suitable for our review. As respondents frankly admitted at both argument and reargument, their complaint did not set forth a claim under the "hindrance" clause. Tr. of Oral Arg. 27 ("the complaint did not make a hinder or prevent claim"); Tr. of Reargument 33–34.[8] Not surprisingly, therefore, neither the District Court nor the Court of Appeals considered the application of that clause to the current facts. The "hindrance"-clause issue is not fairly included within the questions on which petitioners sought certiorari, see Pet. for Cert. i; this Court's Rule 14.1(a),[9] which is alone enough to exclude it from our consideration.[10] Nor is it true that "[t]he

---

[8] These admissions were accurate. The amended complaint alleged, in its two federal causes of action, that petitioners "have conspired to deprive women of their right to travel" and "have conspired . . . for the purpose of denying women seeking abortions . . . their rights to privacy." App. 15–16. These are both "deprivation" claims; neither one makes any allusion to hindrance or prevention of state authorities.

[9] JUSTICE SOUTER contends, post, at 290–291, that the "hindrance"-clause issue was embraced within question four, which asked: "Are respondents' claims under 42 U. S. C. § 1985(3) so insubstantial as to deprive the federal courts of subject matter jurisdiction?" Pet. for Cert. i. This argument founders on the hard (and admitted) reality that "respondents' claims" did not include a "hindrance" claim.

[10] Contrary to JUSTICE SOUTER's suggestion, post, at 290–291, the provision of our Rules giving respondents the right, in their brief in opposition, to restate the questions presented, Rule 24.2, does not give them the power to expand the questions presented, as the Rule itself makes clear. In any event, neither of the questions set forth in the Brief in Opposition fairly

issue was briefed, albeit sparingly, by the parties prior to the first oral argument in this case." *Post*, at 291 (SOUTER, J., concurring in judgment in part and dissenting in part). To the contrary, neither party initiated even the slightest suggestion that the "hindrance" question was an issue to be argued and decided here.[11] That possibility was suggested for the first time by questions from the bench during argument, and was reintroduced, again from the bench, during reargument. (Respondents sought to include a "hindrance"-clause section in their Supplemental Brief on Reargument, but the Court declined to accept that section for filing. See 505 U. S. 1240 (1992).) In sum, the Justices reaching the "hindrance"-clause issue in this case must find in the complaint claims that the respondents themselves have admitted are not there; must resolve a question not presented to, or ruled on by, any lower court; must revise the rule that it is the petition for certiorari (not the brief in opposition and later briefs) that determines the questions presented; and must penalize the parties for not addressing an issue on

---

raises the "hindrance" claim. And there is no support whatever for JUSTICE SOUTER's reliance upon the formulation of the question in respondents' brief on the merits, *post*, at 290, as the basis for deeming the question properly presented—though on the merits, once again, the question referred to by JUSTICE SOUTER is unhelpful.

[11] Respondents' brief asserted that, if the Court did not affirm the judgment on the basis of the "deprivation" clause, then a remand would be necessary, so that respondents could "present a number of contentions respecting [their right-to-privacy] claim" which had not been reached below, including the contention that "petitioners, by means of their blockades, had hindered the police in securing to women their right to privacy." Brief for Respondents 43. Petitioners' reply brief responded that the complaint did not contain such a "hindrance" claim, and that there was "no reason to believe" that the "hindrance" clause "would not entail the same statutory requirements of animus and independent rights which respondents have failed to satisfy under the first clause of the statute." Reply Brief for Petitioners 14–15. These were obviously *not* arguments for resolution of the "hindrance" claim here.

which the Court specifically denied supplemental briefing.[12] That is extraordinary. See, *e. g.*, *R. A. V.* v. *St. Paul*, 505 U. S. 377, 381–382, n. 3 (1992) (citing cases and treatises); *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 97, n. 4 (1991); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 277, and n. 23 (1989).

The dissenters' zeal to reach the question whether there was a "hindrance"-clause violation would be more understandable, perhaps, if the affirmative answer they provided were an easy one. It is far from that. Judging from the statutory text, a cause of action under the "hindrance" clause would seem to require the same "class-based, invidiously discriminatory animus" that the "deprivation" clause requires, and that we have found lacking here. We said in *Griffin* that the source of the animus requirement is "[t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities," 403 U. S., at 102 (emphasis in original)—and such language appears in the "hindrance" clause as well.[13] At oral argument, respondents *conceded* applicability of the animus requirement, though they with-

---

[12] We are unable to grasp the logic whereby JUSTICE SOUTER, who would have us *conclusively resolve* the "hindrance"-clause legal issue against petitioners (despite their lack of opportunity to address it, both here and below), criticizes our opinion, see *post*, at 291–292, for merely *suggesting* (without resolving the "hindrance"-clause issue) the difficulties that inhere in his approach.

[13] In straining to argue that the "hindrance" clause does not have the same animus requirement as the first clause of § 1985(3), JUSTICE STEVENS makes an argument extrapolating from the reasoning of *Kush* v. *Rutledge*, 460 U. S. 719 (1983), which held that the animus requirement expounded in *Griffin* did not apply to a claim under the first clause of § 1985(2). *Post*, at 340–342. But the heart of *Kush*—what the case itself considered "of greatest importance"—was the fact that *Griffin*'s animus requirement rested on "the 'equal protection' language" of § 1985(3), which the first clause of § 1985(2) did not contain. 460 U. S., at 726. Since the "hindrance" clause of § 1985(3) does contain that language, the straightforward application of *Kush* to this case is quite the opposite of what JUSTICE STEVENS asserts.

drew this concession on reargument. Without a race- or class-based animus requirement, the "hindrance" clause of this post-Civil War statute would have been an available weapon against the mass "sit-ins" that were conducted for purposes of promoting desegregation in the 1960's—a wildly improbable result.[14]

Even, moreover, if the "hindrance"-clause claim did not fail for lack of class-based animus, it would still fail unless the "hindrance" clause applies to a private conspiracy aimed at

---

[14] JUSTICE SOUTER contends the sit-in example is inapposite because the sit-ins did not "depriv[e] the owners of the segregated lunch counter[s] of any independently protected constitutional right." *Post*, at 305, n. 10. In the very paragraph to which that footnote is appended, however, JUSTICE SOUTER purports to *leave open* the question whether the "hindrance" clause would apply when the conspiracy "amount[s] to a denial of police protection to individuals who are not attempting to exercise a constitutional right," *post*, at 304, n. 9—such as (presumably) the rights guaranteed by state trespass laws. Certainly the sit-ins violated such state-law rights, or else there would have been no convictions. It is not true, in any case, that the sit-ins did not invade constitutional rights, if one uses that term (as JUSTICE SOUTER does) to include rights constitutionally protected only against official (as opposed to private) encroachment. Surely property owners have a constitutional right not to have government physically occupy their property without due process and without just compensation.

JUSTICE SOUTER's citation of *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984), *post*, at 305, n. 10, and *Lane* v. *Cotton*, 12 Mod. 472 (K. B. 1701), *post*, at 305, n. 10, requires no response. He cites *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964), for the proposition that the 1964 Civil Rights Act's elimination of restaurant-owners' right to exclude blacks from their establishments did not violate the Due Process or Takings Clauses. Assuredly not. But government regulation of commercial use through valid legislation is hardly comparable to government action that would have been the equivalent of what those conducting the sit-ins did: physically occupy private property, against the consent of the owner, without legal warrant. JUSTICE SOUTER cites *Shelley* v. *Kraemer*, 334 U. S. 1 (1948), *post*, at 306, n. 10, to establish (in effect) that there *was*, even before the Civil Rights Act, legal warrant for the physical occupation. Any argument driven to reliance upon an extension of that volatile case is obviously in serious trouble.

rights that are constitutionally protected only against official (as opposed to private) encroachment. JUSTICE STEVENS finds it "clear" that it does, see *post*, at 339, citing, surprisingly, *Carpenters*. To the extent that case illuminates this question at all, it is clearly contrary to the dissent's view, holding that the "deprivation" clause, at least, does *not* cover private conspiracies aimed at rights protected only against state encroachment. JUSTICE O'CONNOR simply asserts without analysis that the "hindrance" clause nonetheless applies to those rights, *post*, at 355–356—although the operative language of the two clauses ("equal protection of the laws") is identical. JUSTICE SOUTER disposes of the rights-guaranteed-against-private-encroachment requirement, and the class-based animus requirement as well, only by (1) undertaking a full-dress reconsideration of *Griffin* and *Carpenters*, (2) concluding that both those cases were wrongly decided, and (3) limiting the damage of those supposed errors by embracing an interpretation of the statute that concededly gives the same language in two successive clauses completely different meanings.[15] See *post*, at 292–303. This

---

[15] JUSTICE SOUTER contends that even without the animus and rights-guaranteed-against-private-encroachment requirements, the "hindrance" clause will still be "significantly limit[ed]" in scope, covering only "conspiracies to act with enough *force . . .* to *overwhelm* the capacity of legal authority to act evenhandedly in administering the law," *post*, at 300 (emphasis added). JUSTICE STEVENS discerns a similar limitation, see *post*, at 341–342. Only JUSTICE SOUTER attempts to find a statutory basis for it. He argues that since § 1985(1) prohibits a conspiracy to prevent "*any person*" (emphasis added) from "discharging any duties," § 1985(3)'s prohibition of a conspiracy directed against "*the constituted authorities*" (emphasis added) must be speaking of something that affects more than a single official, *post*, at 300. This seems to us a complete non sequitur. The difference between "any person" and "constituted authorities" would contain such a significant limitation (if at all) only if the remaining language of the two sections was roughly parallel. But it is not. Section 1985(1), for example, speaks of categorically "prevent[ing]" a person's exercise of his duties, whereas § 1985(3) speaks of "preventing *or hindering*" the constituted authorities. (Emphasis added.) Obviously, one can "hinder" the

formidable task has been undertaken and completed, we reiterate, uninvited by party or *amicus,* and with respect to a cause of action not presented in the pleadings, not asserted or ruled upon below, and not contained in the questions presented on certiorari.

Equally troubling as the dissenters' questionable resolution of a legal issue never presented is their conclusion that the lower court found (or, in the case of JUSTICE SOUTER, can reasonably be thought to have found) the facts necessary to support the (nonexistent) "hindrance" claim. They concede that this requires a finding that the protesters' *purpose* was to prevent or hinder law enforcement officers; but discern such a finding in the District Court's footnote recitation that "the rescuers outnumbered the . . . police officers" and that "the police were unable to prevent the closing of the clinic for more than six (6) hours." *National Organization for Women* v. *Operation Rescue,* 726 F. Supp., at 1489, n. 4. See *post,* at 339 (STEVENS, J., dissenting); *post,* at 356 (O'CONNOR, J., dissenting); *post,* at 306 (SOUTER, J., concurring in judgment in part and dissenting in part). This renders the distinction between "purpose" and "effect" utterly meaningless. Here again, the dissenters (other than JUSTICE SOUTER) would give respondents more than respondents themselves dared to ask. Respondents frankly admitted at the

---

authorities by "preventing" an individual officer. If these dissenters' interpretation of § 1985(3) were adopted, conspiracies to prevent individual state officers from acting would be left entirely uncovered. (Section 1985(1) applies only to officers *of the United States*—which is, of course, the basic distinction between the two provisions.)

Neither dissent explains why the application of enough force to *impede* law enforcement, though not to "overwhelm" or "supplant" it, does not constitute a "hindering"; or, indeed, why only "force" and not bribery or misdirection must be the means of hindrance or prevention. Nothing in the text justifies these limitations. JUSTICE SOUTER's faith in the "severely limited" character of the hindrance clause also depends upon his taking no position on whether the clause protects federal statutory rights and state-protected rights, *post,* at 303–304, n. 9.

original argument, and even at reargument, that the District Court never concluded that impeding law enforcement was the *purpose* of petitioners' protests, and that the "hindrance" claim, if valid in law, required a remand. They were obviously correct.[16]

### III

Because respondents were not entitled to relief under § 1985(3), they were also not entitled to attorney's fees and costs under 42 U. S. C. § 1988. We therefore vacate that award.

Petitioners seek even more. They contend that respondents' § 1985(3) claims were so insubstantial that the District Court lacked subject-matter jurisdiction over the action, including the pendent state claims; and that the injunction should therefore be vacated and the entire action dismissed. We do not agree. While respondents' § 1985(3) causes of action fail, they were not, prior to our deciding of this case, "wholly insubstantial and frivolous," *Bell* v. *Hood,* 327 U. S. 678, 682–683 (1946), so as to deprive the District Court of jurisdiction.

It may be, of course, that even though the District Court had jurisdiction over the state-law claims, judgment on those claims alone cannot support the injunction that was entered. We leave that question for consideration on remand.

---

[16] Because of our disposition of this case, we need not address whether the District Court erred by issuing an injunction, despite the language in § 1985(3) authorizing only "an action for the recovery of damages occasioned by such injury or deprivation." It is curious, however, that the dissenters, though quick to reach and resolve the unpresented "hindrance" issue, assume without analysis the propriety of the injunctive relief that they approve—though the contrary was asserted by the United States as *amicus* in support of petitioners, and the issue was addressed by both parties in supplemental briefs on reargument. See Supplemental Brief for Petitioners on Reargument 4–9; Brief for Respondents on Reargument 9.

\*    \*    \*

JUSTICE STEVENS' dissent observes that this is "a case about the exercise of federal power to control an interstate conspiracy to commit illegal acts," *post*, at 344, and involves "no ordinary trespass," or "picketing of a local retailer," but "the kind of zealous, politically motivated, lawless conduct that led to the enactment of the Ku Klux Act in 1871 and gave it its name," *post*, at 313. Those are certainly evocative assertions, but as far as the point of law we have been asked to decide is concerned, they are irrelevant. We construe the statute, not the views of "most members of the citizenry." *Post*, at 344. By its terms, § 1985(3) covers concerted action by as few as two persons, and does not require even interstate (much less nationwide) scope. It applies no more and no less to completely local action by two part-time protesters than to nationwide action by a full-time force of thousands.[17] And under our precedents it simply does not apply to the sort of action at issue here.

Trespassing upon private property is unlawful in all States, as is, in many States and localities, intentionally obstructing the entrance to private premises. These offenses may be prosecuted criminally under state law, and may also be the basis for state civil damages. They do not, however, give rise to a federal cause of action simply because their objective is to prevent the performance of abortions, any more than they do so (as we have held) when their objective is to stifle free speech.

---

[17] JUSTICE STEVENS chides us for invoking text here, whereas (he says) we rely instead upon "statutory purpose" for our class-based animus requirement—"selectively employ[ing] both approaches to give [§ 1985(3)] its narrowest possible construction." *Post*, at 343, n. 37. That is not so. For our class-based animus requirement we rely, plainly and simply, upon our holding in *Griffin*, *whatever* approach *Griffin* may have used. That holding is (though JUSTICE STEVENS might wish otherwise) an integral part of our jurisprudence extending § 1985(3) to purely private conspiracies.

The judgment of the Court of Appeals is reversed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

In joining the opinion of the Court, I make these added observations.

The three separate dissenting opinions in this case offer differing interpretations of the statute in question, 42 U. S. C. § 1985(3). Given the difficulty of the question, this is understandable, but the dissenters' inability to agree on a single rationale confirms, in my view, the correctness of the Court's opinion. As all recognize, essential considerations of federalism are at stake here. The federal balance is a fragile one, and a false step in interpreting § 1985(3) risks making a whole catalog of ordinary state crimes a concurrent violation of a single congressional statute passed more than a century ago.

Of course, the wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens. Such actions are designed to inflame, not inform. They subvert the civility and mutual respect that are the essential preconditions for the orderly resolution of social conflict in a free society. For this reason, it is important to note that another federal statute offers the possibility of powerful federal assistance for persons who are injured or threatened by organized lawless conduct that falls within the primary jurisdiction of the States and their local governments.

Should state officials deem it necessary, law enforcement assistance is authorized upon request by the State to the Attorney General of the United States, pursuant to 42

U. S. C. § 10501. In the event of a law enforcement emergency as to which "State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law," § 10502(3), the Attorney General is empowered to put the full range of federal law enforcement resources at the disposal of the State, including the resources of the United States Marshals Service, which was presumably the principal practical advantage to respondents of seeking a federal injunction under § 1985(3). See § 10502(2).

If this scheme were to be invoked, the nature and extent of a federal response would be a determination for the Executive. Its authority to act is less circumscribed than our own, but I have little doubt that such extraordinary intervention into local controversies would be ordered only after a careful assessment of the circumstances, including the need to preserve our essential liberties and traditions. Indeed, the statute itself explicitly directs the Attorney General to consider "the need to avoid unnecessary Federal involvement and intervention in matters primarily of State and local concern." § 10501(c)(5).

I do not suggest that this statute is the only remedy available. It does illustrate, however, that Congress has provided a federal mechanism for ensuring that adequate law enforcement resources are available to protect federally guaranteed rights and that Congress, too, attaches great significance to the federal decision to intervene. Thus, even if, after proceedings on remand, the ultimate result is dismissal of the action, local authorities retain the right and the ability to request federal assistance, should they deem it warranted.

JUSTICE SOUTER, concurring in the judgment in part and dissenting in part.

I

This case turns on the meaning of two clauses of 42 U. S. C. § 1985(3) which render certain conspiracies civilly actionable. The first clause (the deprivation clause) covers conspiracies

"for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws";

the second (the prevention clause), conspiracies

"for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . ."

For liability in either instance the statute requires an "act in furtherance of the . . . conspiracy, whereby [a person] is injured in his person or property, or deprived of . . . any right or privilege of a citizen of the United States . . . ."

Prior cases giving the words "equal protection of the laws" in the deprivation clause an authoritative construction have limited liability under that clause by imposing two conditions not found in the terms of the text. An actionable conspiracy must have some racial or perhaps other class-based motivation, *Griffin* v. *Breckenridge*, 403 U. S. 88, 102 (1971), and, if it is "aimed at" the deprivation of a constitutional right, the right must be one secured not only against official infringement, but against private action as well, *Carpenters* v. *Scott*, 463 U. S. 825, 833 (1983). The Court follows these cases in applying the deprivation clause today, and to this extent I take no exception to its conclusion. I know of no reason that would exempt us from the counsel of *stare decisis* in adhering to this settled statutory construction, see *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197 (1991), which Congress is free to change if it should think our prior reading unsound.

## II

The meaning of the prevention clause is not thus settled, however, and starting in Part IV I will give my reasons for reading it without any importation of these extratextual conditions from the deprivation clause. First, however, a word

is in order to show that the prevention clause's construction is properly before us, and to explain why the Court is not in a position to cast doubt on that clause's arguable applicability to the facts indicated by the record, in light of the Court's refusal to allow respondents to address this very issue in the supplemental briefing that was otherwise permitted prior to the reargument of this case.

## A

Respondents' complaint does not limit their theory of liability to the deprivation clause alone, for it alleges simply that petitioners "have conspired with each other and other parties presently unknown for the purpose of denying women seeking abortions at targeted facilities their right to privacy, in violation of 42 U. S. C. § 1985(3)." App. 16.[1] Evidence presented at a hearing before the District Court addressed the issue of prevention or hindrance, leading that court to note that the demonstrators so far outnumbered local police that "[e]ven though 240 rescuers were arrested, the police were unable to prevent the closing of the clinic for more than six (6) hours." *National Organization for Women* v. *Operation Rescue*, 726 F. Supp. 1483, 1489, n. 4 (ED Va. 1989). The applicability of the prevention clause is fairly included within the questions presented, especially as restated by respondents, see Brief for Respondents i (first question presented);[2] Brief in Opposition i; *Holmes* v. *Securities Investor Protection Corp.*, 503 U. S. 258, 267, n. 12 (1992) (respondent has the right under this Court's Rule 24.2 to

---

[1] Contrary to the Court's interpretation, see *ante*, at 279, and n. 8, respondents made this very point at reargument:

"Q: And it wasn't—and it wasn't in the complaint, was it?

"Ms. Ellis: No, Your Honor. The complaint is *[sic]* alleged, though, a violation of section 1985(3) generally." Tr. of Reargument 33–34.

[2] "Whether a conspiracy to blockade medical clinics providing abortions and related services to women, substantial numbers of whom travel from other states, is a basis for a cause of action under 42 U. S. C. § 1985(3)."

restate the questions presented); see also Pet. for Cert. i (petitioners' fourth question presented).[3] The issue was briefed, albeit sparingly, by the parties prior to the first oral argument in this case, see Brief for Respondents 43–44; Reply Brief for Petitioners 14–15, and during that argument was the subject of a question from the bench. See Tr. of Oral Arg. 27–29.

## B

Just as it is therefore proper for me to address the interpretation of the prevention clause and the merits of respondents' position under its terms, it was reasonable for respondents themselves to seek leave to file a supplemental brief addressing that interpretation and those merits prior to the reargument. Their request was nonetheless denied, see 505 U. S. 1240 (1992), though I voted to grant it, and three other Members of the Court dissented on the record from the Court's action to the contrary. Nonetheless, whatever may have been the better decision, denying respondents' request was at least consistent with leaving the consideration of the prevention clause for another day, and in no way barred respondents from pressing a claim under the clause at a later stage of this litigation. A vote to deny the request could, for example, simply have reflected a view that in the absence of more extensive trial court findings than those quoted above it was better to leave the prevention clause for further consideration on the remand that I agree is appropriate. Now, however, in expressing skepticism that the prevention clause could be a basis for relief, the Court begins to close the door that the earlier order left open, a move that is unfair to respondents after their request was denied. While the Court's opinion concentrates on the errors of my ways, it would be difficult not to read it as rejecting a construction of the prevention clause under which respondents might suc-

---

[3] "Are respondents' claims under 42 U. S. C. § 1985(3) so insubstantial as to deprive the federal courts of subject matter jurisdiction?"

ceed, and to that extent as barring their claim under a statutory provision on which they were not allowed to comment in the supplemental briefing that was otherwise permitted before reargument.

### C

Because in my judgment the applicability of the prevention clause was raised, and because there is neither unfairness to respondents in putting forward a statutory interpretation that does not bar their claim, nor unfairness to petitioners who sought no leave to address the issue further, I turn to my own views on the meaning of the prevention clause's terms.

### III

Because this Court has not previously faced a prevention clause claim, the difficult question that arises on this first occasion is whether to import the two conditions imposed on the deprivation clause as limitations on the scope of the prevention clause as well. If we do not, we will be construing the phrase "equal protection of the laws" differently in neighboring provisions of the same statute, and our interpretation will seemingly be at odds with the "natural presumption that identical words used in different parts of the same act [were] intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932). But the presumption is defeasible, and in this instance giving the common phrase an independent reading is exactly what ought to be done.

This is so because the two conditions at issue almost certainly run counter to the intention of Congress, and whatever may have been the strength of this Court's reasons for construing the deprivation clause to include them, those reasons have no application to the prevention clause now before us. To extend the conditions to shorten the prevention clause's reach would, moreover, render that clause inoperative against a conspiracy to which its terms in their plain

meaning clearly should apply, a conspiracy whose perpetrators plan to overwhelm available law enforcement officers, to the point of preventing them from providing a class of victims attempting to exercise a liberty guaranteed them by the Constitution with the police protection otherwise extended to all persons going about their lawful business on streets and private premises. Lest we embrace such an unintended and untoward result, we are obliged to reject any limiting constructions that *stare decisis* does not require.

## A

The amalgam of concepts reflected in 42 U.S.C. § 1985(3) witness the statute's evolution, as § 2 of the Civil Rights Act of 1871, from a bill that would have criminalized conspiracies "to do any act in violation of the rights, privileges, or immunities of any person . . . ," Cong. Globe, 42d Cong., 1st Sess., App. 206 (1871) (statement of Rep. Blair), quoting H. R. 320, § 2, 42d Cong., 1st Sess. (1871), to a statute including a civil cause of action against conspirators and those who "go in disguise" to violate certain constitutional guarantees. See 17 Stat. 13. The amendment of the original bill that concerns us occurred in the House, to calm fears that the statute's breadth would extend it to cover a vast field of traditional state jurisdiction, exceeding what some Members of Congress took to be the scope of congressional power under the Fourteenth Amendment. See Comment, A Construction of Section 1985(c) in Light of Its Original Purpose, 46 U. Chi. L. Rev. 402, 417 (1979). The principal curb placed on the statute's scope was the requirement that actionable conspiracies (not otherwise proscribed on the strength of their threats to voting rights, see § 1985(3)) be motivated by a purpose to deny equal protection of the laws. The sponsor of the amendment, Representative Shellabarger, put it this way: "The object of the amendment is . . . to confine the authority of this law to the prevention of deprivations which

shall attack the equality of rights of American citizens . . . ."
Cong. Globe, 42d Cong., 1st Sess., 478 (1871).

The effect of the equal protection requirement in thus lim-
iting the deprivation clause has received the Court's careful
attention, first in *Collins* v. *Hardyman*, 341 U. S. 651 (1951),
then in a series of more recent cases, *Griffin* v. *Breckenridge*,
403 U. S. 88 (1971), *Great American Fed. Sav. & Loan Assn.*
v. *Novotny*, 442 U. S. 366 (1979), and *Carpenters* v. *Scott*, 463
U. S. 825 (1983). For present purposes, *Griffin* and *Carpen-
ters* stand out.

## B

The *Griffin* Court sought to honor the restrictive intent of
the 42d Congress by reading the "language requiring intent
to deprive of equal protection, or equal privileges and im-
munities," *Griffin*, 403 U. S., at 102 (emphasis omitted), as
demanding proof of "some racial, or perhaps otherwise class-
based, invidiously discriminatory animus behind the conspir-
ators' action." *Ibid.* And while this treatment did, of
course, effectively narrow the scope of the clause, it did so
probably to the point of overkill, unsupported by any indica-
tion of an understanding on the part of Congress that the
animus to deny equality of rights lying at the heart of an
equal protection violation as the legislation's sponsors under-
stood it would necessarily be an animus based on race or
some like character. See *id.*, at 100; Cong. Globe, 42d Cong.,
1st Sess., App. 188 (remarks of Rep. Willard); Cong. Globe,
42d Cong., 1st Sess., at 478 (remarks of Rep. Shellabarger).

While the Congress did not explain its understanding of
statutory equal protection to any fine degree, I am not aware
of (and the *Griffin* Court did not address) any evidence that
in using the phrase "equal protection" in a statute passed
only three years after the ratification of the Fourteenth
Amendment Congress intended that phrase to mean any-
thing different from what the identical language meant in
the Amendment itself. That is not to say, of course, that all
Members of Congress in 1871, or all jurists, would have

agreed on exactly what the phrase did mean, and certainly it is true that the conceptual development of equal protection could hardly have been outlined in advance by the Members of the 42d Congress. But equally is it true that we have no reason to suppose that they meant their statutory equal protection provision to be read any more narrowly than its obvious cognate in the Amendment. *Griffin*, however, gave it just such a reading.

To be sure, there is some resonance between *Griffin*'s animus requirement and those constitutional equal protection cases that deal with classifications calling for strict or heightened scrutiny, as when official discriminations employ such characteristics as race, national origin, alienage, gender, or illegitimacy. See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440–441 (1985) (describing the jurisprudence).[4] But these categories of distinctions based on race or on qualities bearing a more or less close analogy to race do not by any means exhaust the scope of constitutional equal protection. All legislative classifications, whether or not they can be described as having "some racial or perhaps otherwise class-based invidiously discriminatory animus," are subject to review under the Equal Protection Clause, which contains no reference to race, and which has been understood to have this comprehensive scope since at least the late 19th century. See, *e. g., Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 293–294 (1898) (citing cases). A routine legislative classification is, of course, subject only to deferential scrutiny, passing constitutional muster if it bears a rational relationship to some legitimate governmental purpose. *E. g., Cleburne* v. *Cleburne Living Center, Inc., supra* (describing the test); *Schweiker* v. *Wilson*, 450 U. S. 221, 230 (1981).

---

[4] Cf. *Carpenters* v. *Scott*, 463 U. S. 825, 835–839 (1983) (holding that animus against a class based upon its economic views, status, or activities is beyond the reach of the deprivation clause, and reserving the question whether it reaches animus against any class other than "Negroes and those who championed their cause").

But the point is that Fourteenth Amendment equal protection scrutiny is applied to such classifications, and if the scope of "equal protection" in the statute is to balance its constitutional counterpart, the statute ought to cover discriminations that would be impermissible under rational-basis scrutiny.

There is, indeed, even some extratextual evidence of a positive congressional intent to provide just such a statutory reach beyond what *Griffin* would allow. Some of the legislative history of § 2 of the 1871 Act suggests that the omission of any reference to race from the statutory text of equal protection was not the result of inadvertence, and that Congress understood that classifications infringing the statutory notion of equal protection were not to be limited to those based on race or some closely comparable personal quality. The most significant, and often quoted, evidence came from Senator Edmunds, who managed the bill on the Senate floor and remarked that if there were a conspiracy against a person "because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter . . . then this section could reach it." Cong. Globe, 42d Cong., 1st Sess., at 567.[5] These are not, of course, all examples of discrimination based on any class comparable to race, and the Senator's list counters any suggestion that the subject matter of statutory equal protection was meant to be so confined.[6]

---

[5] *Carpenters* did leave open the question whether the deprivation clause might apply to a conspiracy "aimed at any class or organization on account of its political views or activities . . . ." See *Carpenters, supra,* at 837.

[6] Senator Edmunds' quoted language occurred in a discussion of both §§ 2 and 3 of the bill that became the Civil Rights Act of 1871. See Cong. Globe, 42d Cong., 1st Sess., at 567. That Senator Edmunds was referring to the statutory language at issue here is unmistakable because he stated that he was describing the conditions required before a conspiracy could be actionable "under the provisions of all this bill." See *ibid.*

C

Notwithstanding the *Griffin* Court's decision to read the deprivation clause's equal protection element as more restrictive than Fourteenth Amendment equal protection, the Court recognized that in a different respect the statute remained more expansive than its constitutional counterpart, in being aimed at deprivations of equal protection by purely private conspirators. 403 U. S., at 96–97. This very conclusion, in fact, prompted the further concern that the deprivation clause might by its terms apply to facts beyond Congress's constitutional reach. The Court nonetheless obviated the need to address the scope of congressional power at that time by confining itself to a holding that the statute was constitutional at least insofar as it implemented congressional power to enforce the Thirteenth Amendment and the right to travel freely, each of which was "assertable against private as well as governmental interference." *Id.*, at 105.[7]

The Court was then only one step away from putting the deprivation clause in its present shape, a step it took in *Carpenters.* Whereas *Griffin* had held that requiring a purpose to infringe a federal constitutional right guaranteed against private action was sufficient to allay any fear that the deprivation clause was being applied with unconstitutional breadth, *Carpenters* turned this sufficient condition into a necessity insofar as conspiracies to deprive any person or class of persons of federal constitutional rights were concerned, by holding that in the case of such a conspiracy no cause of action could be stated without alleging such an ultimate object of depriving the plaintiff of a right protected

---

[7] This prudential step was presumably unnecessary in light of *United States* v. *Guest*, 383 U. S. 745, 762 (1966) (Clark, J., concurring); *id.*, at 782 (Brennan, J., concurring in part and dissenting in part), in which a majority of the Court concluded that § 5 of the Fourteenth Amendment empowers Congress to enact laws punishing all conspiracies, with or without state action, that interfere with exercise of Fourteenth Amendment rights.

against private action by the Federal Constitution. 463 U. S., at 833.

It was a most significant step. In going no further than to affirm the deprivation clause's constitutionality insofar as it applied to conspiracies to infringe federal constitutional rights guaranteed against private action, the *Griffin* Court had arguably acted with prudent reticence in avoiding a needless ruling on Congress's power to outlaw conspiracies aimed at other rights.[8] But in converting this indisputably constitutional object, of giving relief against private conspiracies to violate federal constitutional rights guaranteed against private action, into the exclusive subject matter of the clause with respect to conspiracies to deprive people of federal constitutional rights, the *Carpenters* Court almost certainly narrowed that clause from the scope Congress had intended. If indeed Congress had meant to confine the statute that narrowly, its application to federal constitutional deprivations in 1871 would not have gone beyond violations of the Thirteenth Amendment, adopted in 1865. (The next clear example of a constitutional guarantee against individual action would not emerge until *United States* v. *Guest,* 383 U. S. 745, 759–760, n. 17 (1966), recognizing a right of interstate travel good against individuals as well as governments.) But if Congress had meant to protect no federal constitutional rights outside those protected by the Thirteenth Amendment, it is hard to see why the drafters would not simply have said so, just as in the third and fourth clauses of § 1985(3) they dealt expressly with infringements of voting rights, already guaranteed against abridgment by the Fifteenth Amendment adopted in 1870.

The *Carpenters* Court might have responded to this objection by suggesting that the textual breadth of the deprivation clause reflects its applicability to conspiracies aimed at violating rights guaranteed under state law or rights guar-

---

[8] But see n. 7, *supra.*

anteed against individual infringement by federal statutory law, since such possible applications were left open by the Court's opinion. See *Carpenters, supra,* at 833–834. But this answer would prompt the even more fundamental objection that there is no textual basis in the deprivation clause (or in the portions of subsection (3) common to all clauses) suggesting that any such individual-infringement limitation was intended at all.

Whether or not the concerns with constitutionality that prompted both the *Griffin* and *Carpenters* holdings were well raised or wisely allayed by those decisions, the solution reached most probably left a lesser deprivation clause than Congress intended. Just as probably, if that solution were imported into the prevention clause, it would work an equally unintended contraction.

### IV

The conclusion that the conditions placed on the deprivation clause narrow its intended scope prompts the question whether the reasons thought to argue in favor of placing such conditions on the deprivation clause apply to the prevention clause. They do not.

### A

We may recall that in holding racial or other class-based animus a necessary element of the requisite purpose to deprive of equal protection, the *Griffin* Court was mindful of the congressional apprehension that the statute might otherwise turn out to be "a general federal tort law." *Griffin,* 403 U. S., at 102. While the Court did not dwell on why it chose a requirement of racial or comparable class-based animus to restrict statutory equal protection, its readiness to read the statutory category more narrowly than its Fourteenth Amendment counterpart is at least understandable when one sees that the scope of conspiracies actionable under the deprivation clause has virtually no textual limit beyond

the need to prove the equal protection element. Without the *Griffin* Court's self-imposed class-based animus requirement, any private conspiracy to deprive of equal protection would be actionable under § 1985(3) so long as the conspirators took some action that produced some harm.

The prevention clause carries no such premonition of liability, however. Its most distinctive requirement, to prove a conspiratorial purpose to "preven[t] or hinde[r] the constituted authorities of any State or Territory from giving or securing . . . the equal protection of the laws," is both an additional element unknown to the deprivation clause and a significantly limiting condition. Private conspiracies to injure according to class or classification are not enough here; they must be conspiracies to act with enough force, of whatever sort, to overwhelm the capacity of legal authority to act evenhandedly in administering the law.

The requirement that the very capacity of the law enforcement authorities must be affected is supported by a comparison of the statutory language of the prevention clause, which touches only those conspiracies with a purpose to "preven[t] or hinde[r] the constituted authorities" of any State or territory from giving or securing equal protection, with the text of § 1985(1), which (among other things) prohibits conspiracies to prevent "any person" from "discharging any duties" of an office under the United States. The contrast makes clear that the words of the prevention clause are not those that Congress used when it meant to deal with every situation in which a single government official was prevented from discharging his duties. To be sure, in an earlier day of scarce law enforcement personnel, rudimentary communication, and slow transportation, in some situations it might have been possible to overthrow the capacity of government by overthrowing one official alone. But a more ambitious conspiratorial object would be required under normal modern conditions, and in order to satisfy the requirement of affecting the law enforcement system sufficiently, such a con-

spiracy would need to envision action capable of countering numbers of officers or injuring their responsive capacity (as by disabling their communication system, for example).

The requirement of an object to thwart the capacity of law enforcement authority to provide equal protection of the laws thus narrows the scope of conspiracies actionable under the prevention clause. It does so to such a degree that no reason appears for narrowing it even more by a view of equal protection more restrictive than that of the Fourteenth Amendment.

### B

Equally inapposite to the prevention clause is the second *Griffin-Carpenter* deprivation clause limitation that where a conspiracy to deny equal protection would interfere with exercise of a federal constitutional right, it be a right "protected against private, as well as official encroachment," *Carpenters*, 463 U. S., at 833. The justification for the Court's initial enquiry concerning rights protected by the Constitution against private action lay in its stated concern about the constitutional limits of congressional power to regulate purely private action. *Griffin, supra,* at 104. Once again, however, the reason that there is no arguable need to import the extratextual limitation from the deprivation clause into the prevention clause lies in the prevention clause's distinctive requirement that the purpose of a conspiracy actionable under its terms must include a purpose to accomplish its object by preventing or hindering officials in the discharge of their constitutional responsibilities. The conspirators' choice of this means to work their will on their victims would be significant here precisely because the act of frustrating or thwarting state officials in their exercise of the State's police power would amount simply to an extralegal way of determining how that state power would be exercised. It would, in real terms, be the exercise of state power itself. To the degree that private conspirators would arrogate the State's police power to themselves to thwart equal protection by

imposing what amounts to a policy of discrimination in place of the Constitution's mandate, their action would be tantamount to state action and be subject as such to undoubted congressional authority to penalize any exercise of state police power that would abridge the equal protection guaranteed by the Fourteenth Amendment. That is to say, Congress is no less able to legislate against unconstitutional exercises of state authority by conspiratorial usurpation than it is to counter unconstitutional action taken by those formally vested with state authority.

This equation of actionable conspiracies with state action is indeed central to the reading given to the prevention clause by the *Griffin* Court. In reasoning that the deprivation clause contained no state action requirement, the Court contrasted the text of that clause with the language of three other provisions indicating, respectively, "three possible forms for a state action limitation on § 1985(3)." *Griffin*, 403 U. S., at 98. One such limitation that might have been read into the deprivation clause was "that there must be interference with or influence upon state authorities." *Ibid.* The Court declined to tack that requirement onto the deprivation clause because its inclusion in the prevention clause indicated that Congress intended it to apply there and nowhere else. The relevant point here is that the whole basis of the *Griffin* Court's analysis was that "interference with or influence on state authorities" was state action, and it follows from *Griffin*'s own premises that no guarantee-against-private-encroachment condition would have been needed even then to allay any apprehension that in reaching the private conspiracies described by the prevention clause, Congress might be exceeding its authority under § 5 of the Fourteenth Amendment.

Accordingly, I conclude that the prevention clause may be applied to a conspiracy intended to hobble or overwhelm the capacity of duly constituted state police authorities to secure equal protection of the laws, even when the conspirators' ani-

mus is not based on race or a like class characteristic, and even when the ultimate object of the conspiracy is to violate a constitutional guarantee that applies solely against state action.

## V

Turning now to the application of the prevention clause as I thus read it, I conclude that a conspiracy falls within the terms of the prevention clause when its purpose is to hinder or prevent law enforcement authorities from giving normal police protection to women attempting to exercise the right to abortion recognized in *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992), and *Roe* v. *Wade,* 410 U. S. 113 (1973). My reason for this is not a view that a State's frustration of an individual's choice to obtain an abortion would, without more, violate equal protection, but that a classification necessarily lacks any positive relationship to a legitimate state purpose, and consequently fails rational-basis scrutiny, when it withdraws a general public benefit on account of the exercise of a right otherwise guaranteed by the Constitution. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972) (applying the Equal Protection Clause and finding no "appropriate governmental interest suitably furthered" by a discrimination that would independently violate the First Amendment). While such a discrimination, were it wrought by the State, could be treated as a burden on the exercise of a right protected by a substantive due process guarantee, see *Casey, supra,* and forbidden as such, the denial of generally available civic benefits to one group solely because its members seek what the Constitution guarantees would just as clearly be a classification for a forbidden purpose, which is to say, independently a violation of equal protection. See *Mosley, supra; Carey* v. *Brown,* 447 U. S. 455 (1980).[9] When private individuals conspire for the pur-

---

[9] I emphasize the substantive due process guarantee at issue here because my analysis rests on the fact that, treating the conspirators as the State, the imposition of restrictions on abortion more strict than those

pose of arrogating and, in effect, exercising the State's power in a way that would thus violate equal protection if so exercised by state officials, the conspiracy becomes actionable when implemented by an act "whereby [a person] is injured in his person or property, or deprived of . . . any right or privilege of a citizen of the United States." § 1985(3).[10]

permitted under the Constitution is not a legitimate public purpose. I do not reach the question whether and how the equal protection requirement in the prevention clause would be violated by a conspiracy which, if charged to the State, would amount to a denial of police protection to individuals who are not attempting to exercise a constitutional right.

[10] The scope of this construction of the prevention clause is limited. It certainly would not forbid any conduct, unlike that at issue here, protected by the First Amendment. Nor would it reach even demonstrations that have only the incidental effect of overwhelming local police authorities, for the statute by its terms requires a "purpose" to "preven[t] or hinde[r] the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." Indeed, it would not necessarily reach even most types of civil disobedience that may be intended to overwhelm police by inviting multiple arrests, because the purpose of these is not ordinarily to discriminate against individuals on the basis of their exercise of an independently protected constitutional right. See n. 9, *supra*.

As to the lunch counter sit-in protests of the early 1960's, to which the Court refers, see *ante*, at 282, and n. 14, if the cases that made it to this Court are representative, these normally were not "mass" demonstrations, but rather led to the arrests of small groups of orderly students who refused to leave segregated establishments when requested to do so. See, e. g., *Bouie* v. *City of Columbia*, 378 U. S. 347, 348 (1964) ("two Negro college students"); *Bell* v. *Maryland*, 378 U. S. 226, 227 (1964) ("12 Negro students"); *Robinson* v. *Florida*, 378 U. S. 153 (1964) (an integrated group of 18 blacks and whites); *Barr* v. *City of Columbia*, 378 U. S. 146, 147 (1964) ("five Negro college students"); *Griffin* v. *Maryland*, 378 U. S. 130, 132 (1964) ("five young Negroes"); *Lombard* v. *Louisiana*, 373 U. S. 267, 268 (1963) ("three Negro and one white college students" seeking service at a refreshment counter "designed to accommodate 24 persons"); *Peterson* v. *Greenville*, 373 U. S. 244, 245, 247 (1963) (10 "Negro boys and girls" seeking service at a lunch counter that "was designed to accommodate 59 persons").

In any event, under the construction I adopt today, a lunch counter sit-in would not have been actionable even if police had been overwhelmed

## VI

The only remaining question is whether respondents have demonstrated, and the District Court has found, a conspiracy

---

because, for example, protesters arrested for trespass were immediately replaced by others who prevented police from barring integration of the lunch counter, leading to mass arrests. This is so because the protesters would not have deprived the owner of the segregated lunch counter of any independently protected constitutional right. See *Roberts* v. *United States Jaycees*, 468 U. S. 609, 618–622 (1984) (no associational right on the part of individual members to exclude women from the Jaycees); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 258–261 (1964) (Title II of the Civil Rights Act of 1964 prohibiting discrimination in places of public accommodation does not work a deprivation of liberty or property without due process of law, nor a taking of property without just compensation).

The Court correctly describes the holding of *Heart of Atlanta*, but then ignores the import of that holding in reaching its conclusion. It argues that government action that "would have been the equivalent of what those conducting the sit-ins did," *i. e.*, government action preventing restaurant owners from discriminating in provision of service against blacks, would have violated the Constitution by "physically occupy[ing the restaurant owners'] property without due process and without just compensation." See *ante*, at 282, n. 14. Whether the "property" to which the Court refers is the lunch counter itself, or the restaurant owners' "right to exclude blacks from their establishments" on the basis of race, *ibid.*, assuming that could even be described as one of that bundle of rights that made up such a restaurant owner's property (a dubious proposition, see, *e. g.*, *Lane* v. *Cotton*, 12 Mod. 472, 484 (K. B. 1701) (common-law duty of innkeepers to serve potential patrons equally, without regard to personal preference, so long as they can be accommodated)), the Court does not explain how, if such government action would violate the Constitution, Title II of the Civil Rights Act could provide "legal warrant for the physical occupation," *ante*, at 282, n. 14, without similarly offending the Takings and Due Process Clauses.

There is, additionally, an independent reason apart from the absence of any constitutional right on the restaurant owner's part, that a sit-in demonstration would not be actionable under my construction of the prevention clause. Although the question was left open in the sit-in cases decided by this Court in 1963 and 1964, see Paulsen, The Sit-In Cases of 1964: "But Answer Came There None," 1964 S. Ct. Rev. 137 (1964), and was then largely mooted by the adoption of the Civil Rights Act of 1964,

thus actionable under the prevention clause.[11]   While I think
that all of the requisite findings would be supportable on this
record, one such finding has not been expressly made.

The District Court found that petitioners conspired to
cause respondent clinics to cease operations by trespassing
on their property and physically blocking entry into and exit
from the clinics, see 726 F. Supp., at 1489, rendering existing
and prospective patients, as well as physicians and medical
staff, unable to enter the clinic to render or receive medical
counseling or advice.   *Ibid.*   The District Court found that
petitioners' actions were characteristically undertaken with-
out notice and typically overwhelmed local police officials in-
vested with the law enforcement component of the State's
police power, rendering them unable for a substantial period
to give or secure the police protection otherwise extended
to all persons going about their lawful business on the streets
and on private premises.   *Id.*, at 1489, 1490, and n. 4.   The
victims were chosen because they would be making choices
falling within the scope of recognized substantive due proc-
ess protection, *id.*, at 1489, choices that may not be made the
basis for discriminatory state classifications applied to deny
state services routinely made available to all persons.   The
District Court found that the effects of thus replacing consti-
tuted authority with a lawless regime would create a sub-
stantial risk of physical harm, *ibid.*, and of damage to re-
spondents' property, *id.*, at 1489–1490, a conclusion amply

---

government enforcement of private segregation by use of a state trespass
law, rather than "securing to all persons . . . the equal protection of
the laws," itself amounted to an unconstitutional act in violation of the
Equal Protection Clause of the Fourteenth Amendment.   Cf. *Shelley* v.
*Kraemer*, 334 U. S. 1 (1948).

[11] As the Court observes, *ante*, at 285, n. 16, I do not address the propri-
ety of injunctive relief in this case even though it was addressed by the
parties in supplemental briefs on reargument.   Unlike the prevention
clause question, it is not "fairly included" within the questions upon which
certiorari was granted, and therefore its consideration by the Court would
be inappropriate.   See this Court's Rule 14.1(a).

supported by the record evidence of personal assaults and tortious restrictions on lawful movement, as well as damage to property, at petitioners' previous demonstrations. See, e. g., Tr. A–25 (Nov. 20, 1989).

These facts would support a conclusion that petitioners' conspiracy had a "purpose of preventing or hindering the constituted authorities of [Virginia] from giving or securing to all persons within [Virginia] the equal protection of the laws," and it might be fair to read such a finding between the lines of the District Court's express conclusions. But the finding was not express, and the better course is to err on the side of seeking express clarification. Certainly that is true here, when other Members of the Court think it appropriate to remand for further proceedings. I conclude therefore that the decision of the Court of Appeals should be vacated, and the case be remanded for consideration of purpose and for a final determination whether implementation of this conspiracy was actionable under the prevention clause of 42 U. S. C. § 1985(3).

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

After the Civil War, Congress enacted legislation imposing on the Federal Judiciary the responsibility to remedy both abuses of power by persons acting under color of state law and lawless conduct that state courts are neither fully competent, nor always certain, to prevent.[1] The Ku Klux Act of 1871, 17 Stat. 13, was a response to the massive, organized lawlessness that infected our Southern States during the post-Civil War era. When a question concerning this statute's coverage arises, it is appropriate to consider whether

---

[1] Thus, for example, the Sherman Act, 26 Stat. 209, was a response to a concern about concentrations of economic power that could not be effectively controlled by state enforcement of common-law doctrines of restraint of trade. See W. Letwin, Law and Economic Policy in America 77–85 (1980).

the controversy has a purely local character or the kind of federal dimension that gave rise to the legislation.

Based on detailed, undisputed findings of fact, the District Court concluded that the portion of § 2 of the Ku Klux Act now codified at 42 U. S. C. § 1985(3) provides a federal remedy for petitioners' violent concerted activities on the public streets and private property of law-abiding citizens. *National Organization for Women* v. *Operation Rescue*, 726 F. Supp. 1483 (ED Va. 1989). The Court of Appeals affirmed. *National Organization for Women* v. *Operation Rescue*, 914 F. 2d 582 (CA4 1990). The holdings of the courts below are supported by the text and the legislative history of the statute and are fully consistent with this Court's precedents. Admittedly, important questions concerning the meaning of § 1985(3) have been left open in our prior cases, including whether the statute covers gender-based discrimination and whether it provides a remedy for the kind of interference with a woman's right to travel to another State to obtain an abortion revealed by this record. Like the overwhelming majority of federal judges who have spoken to the issue,[2] I am persuaded that traditional princi-

---

[2] See *Volunteer Medical Clinic, Inc.* v. *Operation Rescue*, 948 F. 2d 218 (CA6 1991); *National Organization for Women* v. *Operation Rescue*, 914 F. 2d 582 (CA4 1990) (case below); *New York State National Organization for Women* v. *Terry*, 886 F. 2d 1339 (CA2 1989), cert. denied, 495 U. S. 947 (1990); *Women's Health Care Services* v. *Operation Rescue-National*, 773 F. Supp. 258 (Kan. 1991); *Planned Parenthood Assn. of San Mateo Cty.* v. *Holy Angels Catholic Church*, 765 F. Supp. 617 (ND Cal. 1991); *National Organization for Women* v. *Operation Rescue*, 747 F. Supp. 760 (DC 1990); *Southwestern Medical Clinics of Nevada, Inc.* v. *Operation Rescue*, 744 F. Supp. 230 (Nev. 1989); *National Organization for Women* v. *Operation Rescue*, 726 F. Supp. 1483 (ED Va. 1989) (case below); *Portland Feminist Women's Health Center* v. *Advocates for Life, Inc.*, 712 F. Supp. 165 (Ore. 1988); *Roe* v. *Operation Rescue*, 710 F. Supp. 577 (ED Pa. 1989); and *New York State National Organization for Women* v. *Terry*, 697 F. Supp. 1324 (SDNY 1988); but see *Lucero* v. *Operation Rescue of Birmingham*, 954 F. 2d 624 (CA11 1992); *National Abortion Federation* v. *Operation Rescue*, 721

ples of statutory construction readily provide affirmative answers to these questions.

It is unfortunate that the Court has analyzed this case as though it presented an abstract question of logical deduction rather than a question concerning the exercise and allocation of power in our federal system of government. The Court ignores the obvious (and entirely constitutional) congressional intent behind § 1985(3) to protect this Nation's citizens from what amounts to the theft of their constitutional rights by organized and violent mobs across the country.

The importance of the issue warrants a full statement of the facts found by the District Court before reaching the decisive questions in this case.

I

Petitioners are dedicated to a cause that they profoundly believe is far more important than mere obedience to the laws of the Commonwealth of Virginia or the police power of its cities. To achieve their goals, the individual petitioners "have agreed and combined with one another and with defendant Operation Rescue to organize, coordinate and participate in 'rescue' demonstrations at abortion clinics in various parts of the country, including the Washington metropolitan area. The purpose of these 'rescue' demonstrations is to disrupt operations at the target clinic and indeed ultimately to cause the clinic to cease operations entirely."[3]

The scope of petitioners' conspiracy is nationwide; it far exceeds the bounds or jurisdiction of any one State. They have blockaded clinics across the country, and their activities have been enjoined in New York, Pennsylvania, Washington, Connecticut, California, Kansas, and Nevada, as well as the

---

F. Supp. 1168 (CD Cal. 1989); and *Lucero* v. *Operation Rescue of Birmingham*, 772 F. Supp. 1193 (ND Ala. 1991).

[3] *National Organization for Women* v. *Operation Rescue*, 726 F. Supp., at 1488.

District of Columbia metropolitan area. They have carried out their "rescue" operations in the District of Columbia and Maryland in defiance of federal injunctions.[4]

Pursuant to their overall conspiracy, petitioners have repeatedly engaged in "rescue" operations that violate local law and harm innocent women. Petitioners trespass on clinic property and physically block access to the clinic, preventing patients, as well as physicians and medical staff, from entering the clinic to render or receive medical or counseling services. Uncontradicted trial testimony demonstrates that petitioners' conduct created a "substantial risk that existing or prospective patients may suffer physical or mental harm."[5] Petitioners make no claim that their conduct is a legitimate form of protected expression.

Petitioners' intent to engage in repeated violations of law is not contested. They trespass on private property, interfere with the ability of patients to obtain medical and coun-

---

[4] Id., at 1490.

[5] Id., at 1489. The District Court's findings described the risk of serious physical and psychological injuries caused by petitioners' conduct:

"For example, for some women who elect to undergo an abortion, clinic medical personnel prescribe and insert a pre-abortion laminaria to achieve cervical dilation. In these instances, timely removal of the laminaria is necessary to avoid infection, bleeding and other potentially serious complications. If a 'rescue' demonstration closes a clinic, patients requiring the laminaria removal procedure or other vital medical services must either postpone the required treatment and assume the attendant risks or seek the services elsewhere. Uncontradicted trial testimony established that there were numerous economic and psychological barriers to obtaining these services elsewhere. Hence, a 'rescue' demonstration creates a substantial risk that a clinic's patients may suffer physical and mental harm.

". . . Uncontradicted trial testimony by Dickinson-Collins, a trained mental health professional, established that blockading clinics and preventing patient access could cause stress, anxiety and mental harm (i) to women with abortions scheduled for that time, (ii) to women with abortion procedures (i. e., laminaria insertion) already underway and (iii) to women seeking counselling concerning the abortion decision." Ibid. (footnote omitted).

seling services, and incite others to engage in similar unlawful activity. They also engage in malicious conduct, such as defacing clinic signs, damaging clinic property, and strewing nails in clinic parking lots and on nearby public streets.[6] This unlawful conduct is "vital to [petitioners'] avowed purposes and goals."[7] They show no signs of abandoning their chosen method for advancing their goals.[8]

Rescue operations effectively hinder and prevent the constituted authorities of the targeted community from providing local citizens with adequate protection.[9] The lack of advance warning of petitioners' activities, combined with limited police department resources, makes it difficult for the police to prevent petitioners' ambush by "rescue" from closing a clinic for many hours at a time. The trial record is replete with examples of petitioners overwhelming local law enforcement officials by sheer force of numbers. In one "rescue" in Falls Church, Virginia, the demonstrators vastly outnumbered the police department's complement of 30 deputized officers. The police arrested 240 rescuers, but were unable to prevent the blockade from closing the clinic for more than six hours. Because of the large-scale, highly organized nature of petitioners' activities, the local authorities are unable to protect the victims of petitioners' conspiracy.[10]

---

[6] *Ibid.*

[7] *Id.*, at 1495.

[8] *Id.*, at 1490.

[9] Presumably this fact, as well as her understanding of the jurisdictional issue, contributed to the decision of the attorney general of Virginia to file a brief *amicus curiae* supporting federal jurisdiction in this case. The city attorney for Falls Church, Virginia, has also filed an *amicus curiae* brief supporting respondents.

[10] See *id.*, at 1489, n. 4. The District Court's findings contain several examples illustrating the character of petitioners' "rescue" operations: "For example, on almost a weekly basis for the last five (5) years, Commonwealth Women's Clinic has been the target of 'rescue' demonstrations by Operation Rescue. One of the largest of these occurred on October 29, 1988. That 'rescue' succeeded in closing the Clinic from 7:00 a.m. to 1:30 p.m., notwithstanding the efforts of the Falls Church Police Depart-

Petitioners' conspiracy had both the purpose and effect of interfering with interstate travel. The number of patients who cross state lines to obtain an abortion obviously depends, to some extent, on the location of the clinic and the quality of its services. In the Washington metropolitan area, where interstate travel is routine, 20 to 30 percent of the patients at some clinics were from out of State, while at least one clinic obtained over half its patients from other States. The District Court's conclusions in this regard bear repetition:

> "[Petitioners] engaged in this conspiracy for the purpose, either directly or indirectly, of depriving women seeking abortions and related medical and counselling services, of the right to travel. The right to travel includes the right to unobstructed interstate travel to obtain an abortion and other medical services. . . : Testimony at trial establishes that clinics in Northern Virginia provide medical services to plaintiffs' members and patients who travel from out of state. Defendants' activities interfere with these persons' right to unimpeded interstate travel by blocking their access to abor-

---

ment. 'Rescuers' did more than trespass on to the clinic's property and physically block all entrances and exits. They also defaced clinic signs, damaged fences and blocked ingress into and egress from the Clinic's parking lot by parking a car in the center of the parking lot entrance and deflating its tires. On this and other occasions, rescuers' have strewn nails on the parking lots and public streets abutting the clinics to prevent the passage of any cars. Less than a year later, in April 1989, a similar 'rescue' demonstration closed the Metropolitan Family Planning Institute in the District of Columbia for approximately four (4) hours.

". . . Clinics in Maryland and the District of Columbia were closed as a result of 'rescues' on November 10, 11 and 12, 1989. The following weekend, on November 18, 1989, the Hillcrest Women's Surgi-Center in the District of Columbia was closed for eleven (11) hours as a result of a 'rescue' demonstration. Five (5) women who had earlier commenced the abortion process at the clinic by having laminaria inserted were prevented by 'rescuers' from entering the clinic to undergo timely laminaria removal." *Id.*, at 1489–1490 (footnote omitted).

tion clinics. And, the Court is not persuaded that clinic closings affect only intra-state travel, from the street to the doors of the clinics. Were the Court to hold otherwise, interference with the right to travel could occur only at state borders. This conspiracy, therefore, effectively deprives organizational plaintiffs' non-Virginia members of. their right to interstate travel." [11]

To summarize briefly, the evidence establishes that petitioners engaged in a nationwide conspiracy; to achieve their goal they repeatedly occupied public streets and trespassed on. the premises of private citizens in order to prevent or hinder the constituted authorities from protecting access to abortion clinics by women, a substantial number of whom traveled in interstate commerce to reach the destinations blockaded by petitioners. The case involves no ordinary trespass, nor anything remotely resembling the peaceful picketing of a local retailer. It presents a striking contemporary example of the kind of zealous, politically motivated, lawless conduct that led to the enactment of the Ku Klux Act in 1871 and gave it its name.

## II

The text of the statute makes plain the reasons Congress considered a federal remedy for such conspiracies both necessary and appropriate. In relevant part the statute contains two independent clauses which I separately identify in the following quotation:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, [first] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or [second] for the pur-

---

[11] Id., at 1493.

pose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U. S. C. § 1985(3).

The plain language of the statute is surely broad enough to cover petitioners' conspiracy. Their concerted activities took place on both the public "highway" and the private "premises of another." The women targeted by their blockade fit comfortably within the statutory category described as "any person or class of persons." Petitioners' interference with police protection of women seeking access to abortion clinics "directly or indirectly" deprived them of equal protection of the laws and of their privilege of engaging in lawful travel. Moreover, a literal reading of the second clause of the statute describes petitioners' proven "purpose of preventing or hindering the constituted authorities of any State or Territory" from securing "to all persons within such State or Territory the equal protection of the laws."

No one has suggested that there would be any constitutional objection to the application of this statute to petitioners' nationwide conspiracy; it is obvious that any such constitutional claim would be frivolous. Accordingly, if, as it sometimes does, the Court limited its analysis to the statutory text, it would certainly affirm the judgment of the Court of Appeals. For both the first clause and the second clause of § 1985(3) plainly describe petitioners' conspiracy.

## III

The Court bypasses the statute's history, intent, and plain language in its misplaced reliance on prior precedent. Of course, the Court has never before had occasion to construe the second clause of § 1985(3). The first clause, however, has been narrowly construed in *Collins* v. *Hardyman*, 341 U. S. 651 (1951), *Griffin* v. *Breckenridge*, 403 U. S. 88 (1971), and *Carpenters* v. *Scott*, 463 U. S. 825 (1983). In the first of these decisions, the Court held that § 1985(3) did not apply to wholly private conspiracies.[12] In *Griffin* the Court rejected that view but limited the application of the statute's first clause to conspiracies motivated by discriminatory intent to deprive plaintiffs of rights constitutionally protected against private (and not just governmental) deprivation. Finally, *Carpenters* reemphasized that the first clause of § 1985(3) offers no relief from the violation of rights protected against only state interference. 463 U. S., at 830–834. To date, the Court has recognized as rights protected against private encroachment (and, hence, by § 1985(3)) only the constitutional right of interstate travel and rights granted by the Thirteenth Amendment.

For present purposes, it is important to note that in each of these cases the Court narrowly construed § 1985(3) to avoid what it perceived as serious constitutional problems with the statute itself. Because those problems are not at issue here, it is even more important to note a larger point about our precedent. In the course of applying Civil War era legislation to civil rights issues unforeseeable in 1871, the Court has adopted a flexible approach, interpreting the statute to reach current concerns without exceeding the bounds of its intended purposes or the constitutional powers

---

[12] The Court subsequently noted that the constitutional concerns that had supported the limiting construction adopted in *Collins* would not apply to "a private conspiracy so massive and effective that it supplants [state] authorities and thus satisfies the state action requirement." *Griffin*, 403 U. S., at 98, and n. 5.

of Congress.[13]   We need not exceed those bounds to apply the statute to these facts.

The facts and decision in *Griffin* are especially instructive here.   In overruling an important part of *Collins*, the Court found that the conduct the plaintiffs alleged—a Mississippi highway attack on a white man suspected of being a civil rights worker and the two black men who were passengers in his car—was emblematic of the antiabolitionist violence that § 1985(3) was intended to prevent.   A review of the legislative history demonstrated, on the one hand, that Congress intended the coverage of § 1985(3) to reach purely private conspiracies, but on the other hand, that it wanted to avoid the "constitutional shoals" that would lie in the path of a general federal tort law punishing an ordinary assault and battery committed by two or more persons.   The racial motivation for the battery committed by the defendants in the case before the Court placed their conduct "close to the core of the coverage intended by Congress."   403 U. S., at 103. It therefore satisfied the limiting construction that the Court placed on the reference to a deprivation of "equal" privileges and immunities in the first clause of the Act.   The Court explained that construction:

> "The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, [Cong. Globe, 42d Cong., 1st Sess., App. 100 (1871)].   The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps other-

---

[13] The Court's caution in this regard echoes the recorded debates of the enacting Congress itself.   See *id.*, at 99–102.

wise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*, at 101–102.

A footnote carefully left open the question "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable *under the portion of § 1985(3) before us.*" *Id.*, at 102, n. 9 (emphasis added). Neither of our two more recent opinions construing § 1985(3) has answered the question left open in *Griffin* or has involved the second clause of the statute.[14]

After holding that the statute did apply to such facts, and that requiring a discriminatory intent would prevent its overapplication, the *Griffin* Court held that § 1985(3) would be within the constitutional power of Congress if its coverage were limited to constitutional rights secured against private action. The facts in that case identified two such grounds.

---

[14] In *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366 (1979), we held that § 1985(3) does not provide a remedy for a retaliatory discharge that violated Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* We had no occasion to agree or to disagree with the Court of Appeals' holding that conspiracies motivated by an invidious animus against women fall within § 1985(3) because we concluded that the deprivation of the subsequently created Title VII statutory right could not form the basis for a § 1985(3) claim.

*Carpenters* v. *Scott*, 463 U. S. 825 (1983), arose out of a labor dispute in which union organizers had assaulted two nonunion employees and vandalized equipment owned by the employer. We held that § 1985(3) did not provide a remedy for two reasons. First, the alleged violation of the First Amendment was insufficient because there was no claim that the State was involved in the conspiracy or that the aim of the conspiracy was to influence state action. Second, we concluded that group action resting on economic or commercial animus, such as animus in favor of or against unionization, did not constitute the kind of class-based discrimination discussed in our opinion in *Griffin* v. *Breckenridge*, 403 U. S. 88 (1971). As the introductory paragraph to the opinion made clear, the case involved only the scope of the remedy made available by the first clause of § 1985(3). See 463 U. S., at 827.

One ground was § 2 of the Thirteenth Amendment. The other was the right to travel. The Court explained how the petitioners could show a violation of the latter. As with the class-based animus requirement, the Court was less concerned with the specifics of that showing than with the constitutionality of § 1985(3); it emphasized that whatever evidence they presented had to "make it clear that the petitioners had suffered from conduct that Congress may reach under its power to protect the right of interstate travel." *Id.*, at 106.

The concerns that persuaded the Court to adopt a narrow reading of the text of § 1985(3) in *Griffin* are not presented in this case. Giving effect to the plain language of § 1985(3) to provide a remedy against the violent interference with women exercising their privilege—indeed, their right—to engage in interstate travel to obtain an abortion presents no danger of turning the statute into a general tort law. Nor does anyone suggest that such relief calls into question the constitutional powers of Congress. When the *Griffin* Court rejected its earlier holding in *Collins*, it provided both an "authoritative construction" of § 1985(3), see *ante*, at 289 (SOUTER, J., concurring in part and dissenting in part), and a sufficient reason for rejecting the doctrine of *stare decisis* whenever it would result in an unnecessarily narrow construction of the statute's plain language. The Court wrote:

> "Whether or not *Collins* v. *Hardyman* was correctly decided on its own facts is a question with which we need not here be concerned. But it is clear, in the light of the evolution of decisional law in the years that have passed since that case was decided, that many of the constitutional problems there perceived simply do not exist. Little reason remains, therefore, not to accord to the words of the statute their apparent meaning." 403 U. S., at 95–96.

Once concerns about the constitutionality of § 1985(3) are properly put aside, we can focus more appropriately on giving the statute its intended effect. On the facts disclosed by this record, I am convinced that both the text of the statute and its underlying purpose support the conclusion that petitioners' conspiracy was motivated by a discriminatory animus and violated respondents' protected right to engage in interstate travel.

## IV

The question left open in *Griffin*—whether the coverage of § 1985(3) is limited to cases involving racial bias—is easily answered. The text of the statute provides no basis for excluding from its coverage any cognizable class of persons who are entitled to the equal protection of the laws. This Court has repeatedly and consistently held that gender-based classifications are subject to challenge on constitutional grounds, see, *e. g., Reed* v. *Reed,* 404 U. S. 71 (1971); *Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718 (1982). A parallel construction of post-Civil War legislation that, in the words of Justice Holmes, "dealt with Federal rights and with all Federal rights, and protected them in the lump," *United States* v. *Mosley,* 238 U. S. 383, 387 (1915), is obviously appropriate.

The legislative history of the Act confirms the conclusion that even though it was primarily motivated by the lawless conduct directed at the recently emancipated citizens, its protection extended to "all the thirty-eight millions of the citizens of this nation." Cong. Globe, 42d Cong., 1st Sess., 484 (1871). Given then prevailing attitudes about the respective roles of males and females in society, it is possible that the enacting legislators did not anticipate protection of women against class-based discrimination. That, however, is not a sufficient reason for refusing to construe the statutory text in accord with its plain meaning, particularly when that construction fulfills the central purpose of the legislation. See *Union Bank* v. *Wolas,* 502 U. S. 151, 155–156 (1991).

The gloss that Justice Stewart placed on the statute in *Griffin*, then, did not exclude gender-based discrimination from its coverage. But it does require us to resolve the question whether a conspiracy animated by the desire to deprive women of their right to obtain an abortion is "class based."

V

The terms "animus" and "invidious" are susceptible to different interpretations. The Court today announces that it could find class-based animus in petitioners' mob violence "only if one of two suggested propositions is true: (1) that opposition to abortion can reasonably be presumed to reflect a sex-based intent, or (2) that intent is irrelevant, and a class-based animus can be determined solely by effect." *Ante,* at 270.

The first proposition appears to describe a malevolent form of hatred or ill will. When such an animus defends itself as opposition to conduct that a given class engages in exclusively or predominantly, we can readily unmask it as the intent to discriminate against the class itself. See *ibid.* *Griffin*, for instance, involved behavior animated by the desire to keep African-American citizens from exercising their constitutional rights. The defendants were no less guilty of a class-based animus because they *also* opposed the cause of desegregation or rights of African-American suffrage, and the Court did not require the plaintiffs in *Griffin* to prove that their beatings were motivated by hatred for African-Americans. Similarly, a decision disfavoring female lawyers,[15] female owners of liquor estab-

---

[15] See *Bradwell* v. *State*, 16 Wall. 130 (1873). The reasoning of the concurring Justices surely evidenced invidious animus, even though it rested on traditional views about a woman's place in society, rather than on overt hostility toward women. These Justices wrote:

"[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and

lishments,[16] or pregnant women[17] may appropriately be characterized as "invidiously discriminatory" even if the decisionmakers have goals other than—or in addition to—discrimination against individual women.[18]

The second proposition deserves more than the Court's disdain. It plausibly describes an assumption that intent

proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. So firmly fixed was this sentiment in the founders of the common law that it became a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state; and, notwithstanding some recent modifications of this civil status, many of the special rules of law flowing from and dependent upon this cardinal principle still exist in full force in most States. One of these is, that a married woman is incapable, without her husband's consent, of making contracts which shall be binding on her or him. . . .

". . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator." Id., at 141 (Bradley, J., joined by Swayne and Field, JJ., concurring in judgment).

The Justices who subscribed to those views were certainly not misogynists, but their basic attitude—or animus—toward women is appropriately characterized as "invidiously discriminatory."

[16] See Goesaert v. Cleary, 335 U. S. 464 (1948). In a prescient dissenting opinion written in 1948 that accords with our current understanding of the idea of equality, Justice Rutledge appropriately selected the word "invidious" to characterize a statutory discrimination between male and female owners of liquor establishments. Id., at 468.

[17] See Nashville Gas Co. v. Satty, 434 U. S. 136 (1977).

[18] Last Term in Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources, 504 U. S. 353 (1992), we found that Michigan had discriminated against interstate commerce in garbage even though its statutory scheme discriminated against most of the landfill operators in Michigan as well as those located in other States.

lies behind the discriminatory effects from which Congress intended § 1985(3) to protect American citizens. Congress may obviously offer statutory protections against behavior that the Constitution does not forbid, including forms of discrimination that undermine § 1985(3)'s guarantee of equal treatment under the law. Regardless of whether the examples of paternalistic discrimination given above involve a constitutional violation, as a matter of statutory construction it is entirely appropriate to conclude that each would satisfy the class-based animus requirement because none of them poses any danger of converting § 1985(3) into a general tort law or creating concerns about the constitutionality of the statute.

*Both* forms of class-based animus that the Court proposes are present in this case.

### Sex-Based Discrimination

It should be noted that a finding of class-based animus in this case does not require finding that to disfavor abortion is "*ipso facto*" to discriminate invidiously against women. See *ante*, at 271. Respondents do not take that position, and they do not rely on abstract propositions about "opposition to abortion" *per se.* See *ante*, at 269–270. Instead, they call our attention to a factual record showing a particular lawless conspiracy employing force to prevent women from exercising their constitutional rights. Such a conspiracy, in the terms of the Court's first proposition, may "reasonably be presumed to reflect a sex-based intent." See *ante*, at 270.

To satisfy the class-based animus requirement of § 1985(3), the conspirators' conduct need not be motivated by hostility toward individual women. As women are unquestionably a protected class, that requirement—as well as the central purpose of the statute—is satisfied if the conspiracy is aimed at conduct that only members of the protected class have the capacity to perform. It is not necessary that the intended effect upon women be the sole purpose of the conspiracy. It

is enough that the conspiracy be motivated "at least in part" by its adverse effects upon women. Cf. *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279 (1979); *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 265–266 (1977). The immediate and intended effect of this conspiracy was to prevent women from obtaining abortions. Even assuming that the ultimate and indirect consequence of petitioners' blockade was the legitimate and nondiscriminatory goal of saving potential life, it is undeniable that the conspirators' immediate purpose was to affect the conduct of women.[19] Moreover, petitioners target women *because of* their sex, specifically, because of their capacity to become pregnant and to have an abortion.[20]

---

[19] In *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256 (1979), we inquired whether the challenged conduct was undertaken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.,* at 279. It would be nonsensical to say that petitioners blockaded clinics "in spite of" the effect of the blockades on women.

[20] The Court mischaracterizes this analysis by ignoring the distinction between a classification that is sex based and a classification that constitutes sexual discrimination prohibited by the Constitution or by statute. See *ante,* at 272, n. 3. A classification is sex based if it classifies on the basis of sex. As the capacity to become pregnant is a characteristic necessarily associated with one sex, a classification based on the capacity to become pregnant is a classification based on sex.

See Sunstein, Neutrality in Constitutional Law (With Special Reference to Pornography, Abortion, and Surrogacy), 92 Colum. L. Rev. 1, 32–33 (1992) (footnotes omitted):

"The first point is that restrictions on abortion should be seen as a form of sex discrimination. The proper analogy here is to a law that is targeted solely at women, and thus contains a de jure distinction on the basis of sex. A statute that is explicitly addressed to women is of course a form of sex discrimination. A statute that involves a defining characteristic or a biological correlate of being female should be treated in precisely the same way. If a law said that 'no woman' may obtain an abortion, it should readily be seen as a sex-based classification. A law saying that 'no person' may obtain an abortion has the same meaning.

"The fact that some men may also be punished by abortion laws—for example, male doctors—does not mean that restrictions on abortion are

It is also obvious that petitioners' conduct was motivated "at least in part" by the invidious belief that individual women are not capable of deciding whether to terminate a pregnancy, or that they should not be allowed to act on such a decision. Petitioners' blanket refusal to allow any women access to an abortion clinic overrides the individual class member's choice, no matter whether she is the victim of rape or incest, whether the abortion may be necessary to save her life,[21] or even whether she is merely seeking advice or information about her options. Petitioners' conduct is designed to deny *every* woman the opportunity to exercise a constitutional right that *only* women possess. Petitioners' conspiracy, which combines massive defiance of the law with violent obstruction of the constitutional rights of their fellow citizens, represents a paradigm of the kind of conduct that the statute was intended to cover.[22]

---

sex-neutral. Laws calling for racial segregation make it impermissible for whites as well as blacks to desegregate, and this does not make such laws race-neutral. Nor would it be correct to say that restrictions on abortion merely have a discriminatory impact on women, and that they should therefore be treated in the same way as neutral weight and height requirements having disproportionate effects on women. With such requirements, men and women are on both sides of the legal line; but abortion restrictions exclusively target women. A law that prohibited pregnant women, or pregnant people, from appearing on the streets during daylight would readily be seen as a form of de jure sex discrimination. A restriction on abortion has the same sex-based features."

[21] The Court refers to petitioners' opposition to "voluntary" abortion. *Ante*, at 270. It is not clear what the Court means by "voluntary" in this context, but petitioners' opposition is certainly not limited to "elective" abortions. Petitioners' conduct evidences a belief that it is better for a woman to die than for the fetus she carries to be aborted. See nn. 5, 10, *supra*.

[22] The Court's discussion of the record suggests that the District Court made a finding that petitioners were not motivated by a purpose directed at women as a class. See *ibid.* The District Court made no such finding, and such a finding would be inconsistent with the District Court's conclusion that petitioners' gender-based animus satisfied the class-based animus requirement of § 1985(3), see 726 F. Supp., at 1492.

The Court recognizes that the requisite animus may "readily be presumed" on the basis of the relationship between the targeted activity and membership in the targeted class. *Ante*, at 270. But the Court insists that opposition to an act engaged in exclusively by members of a protected class does not involve class-based animus unless the act itself is an "irrational object of disfavor." *Ibid.* The Court's view requires a subjective judicial interpretation inappropriate in the civil rights context, where what seems rational to an oppressor seems equally irrational to a victim. Opposition to desegregation, and opposition to the voting rights of both African-Americans and women, were certainly at one time considered "rational" propositions. But such propositions were never free of the class-based discrimination from which § 1985(3) protects the members of both classes.

The activity of traveling to a clinic to obtain an abortion is, of course, exclusively performed by women. Opposition to that activity may not be "irrational," but violent interference with it is unquestionably "aimed at" women. The Court offers no justification for its newly crafted suggestion that *deliberately* imposing a burden on an activity exclusively performed by women is not class-based discrimination unless opposition to the activity is also irrational. The Court is apparently willing to presume discrimination only when opposition to the targeted activity is—in its eyes—wholly pretextual: that is, when it thinks that no rational person would oppose the activity, except as a means of achieving a separate and distinct goal.[28] The Court's analysis makes sense only if every member of a protected class

---

[28] The limitations of this analysis are apparent from the example the Court invokes: "A tax on wearing yarmulkes is a tax on Jews." *Ante*, at 270. The yarmulke tax would not become less of a tax on Jews if the taxing authorities really did wish to burden the wearing of yarmulkes. And the fact that many Jews do not wear yarmulkes—like the fact that many women do not seek abortions—would not prevent a finding that the tax—like petitioners' blockade—targeted a particular class.

exercises all of her constitutional rights, or if no rational excuse remains for otherwise invidious discrimination. Not every member of every protected class chooses to exercise all of his or her constitutional rights; not all of them want to. That many women do not obtain abortions—that many women *oppose* abortion—does not mean that those who violently prevent the exercise of that right by women who do exercise it are somehow cleansed of their discriminatory intent. In enacting a law such as § 1985(3) for federal courts to enforce, Congress asked us to see through the excuses— the "rational" motives—that will always disguise discrimination. Congress asked us to foresee, and speed, the day when such discrimination, no matter how well disguised, would be unmasked.

## Statutory Relief from Discriminatory Effects

As for the second definition of class-based animus, disdainfully proposed by the Court, *ibid.*, there is no reason to insist that a statutory claim under § 1985(3) must satisfy the restrictions we impose on constitutional claims under the Fourteenth Amendment. A congressional statute may offer relief from discriminatory effects even if the Fourteenth Amendment prevents only discriminatory intent.

The Court attempts to refute the finding of class-based animus by relying on our cases holding that the governmental denial of either disability benefits for pregnant women or abortion funding does not violate the Constitution. That reliance is misplaced for several reasons. Cases involving constitutional challenges to governmental plans denying financial benefits to pregnant women, and cases involving equal protection challenges to facially neutral statutes with discriminatory effects, involve different concerns and reach justifiably different results than a case involving citizens' statutory protection against burdens imposed on their constitutional rights.

In *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), we faced the question whether a State's disability insurance system violated the Fourteenth Amendment by excluding benefits for normal pregnancy. A majority of the Court concluded that the system did not constitute discrimination on the basis of sex prohibited by the Equal Protection Clause. *Geduldig*, of course, did not purport to establish that, as a matter of logic, a classification based on pregnancy is gender neutral. As an abstract statement, that proposition is simply false; a classification based on pregnancy is a sex-based classification, just as, to use the Court's example, a classification based on the wearing of yarmulkes is a religion-based classification. Nor should *Geduldig* be understood as holding that, as a matter of law, pregnancy-based classifications never violate the Equal Protection Clause. In fact, as the language of the opinion makes clear, what *Geduldig* held was that not every legislative classification based on pregnancy was equivalent, for equal protection purposes, to the explicitly gender-based distinctions struck down in *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), and *Reed* v. *Reed*, 404 U. S. 71 (1971). That *Geduldig* must be understood in these narrower terms is apparent from the sentence which the Court quotes in part: "While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification *like those considered in Reed, supra, and Frontiero, supra.*" *Geduldig*, 417 U. S., at 496, n. 20 (emphasis added).[24]

Central to the holding in *Geduldig* was the Court's belief that the disability insurance system before it was a plan that

---

[24] To his argument quoted in n. 19, *supra*, Professor Sunstein adds: "It is by no means clear that *Geduldig* would be extended to a case in which pregnant people were (for example) forced to stay indoors in certain periods, or subjected to some other unique criminal or civil disability." 92 Colum. L. Rev., at 32, n. 122.

conferred benefits evenly on men and women.[25]  Later cases confirmed that the holding in *Geduldig* depended on an analysis of the insurance plan as a benefit program with an overall nondiscriminatory effect.[26]  *Nashville Gas Co.* v. *Satty,* 434 U. S. 136 (1977), applied a statute without an intent requirement to an employer's policy denying accumulated seniority to employees returning from pregnancy leave.  Notwithstanding *Geduldig,* the Court found that the policy burdened only women, and therefore constituted discrimination on the basis of sex.  The Court stated that "petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer.  The distinction between benefits and burdens is more than one of semantics."  434 U. S., at 142.[27]  The distinction between

---

[25] The Court emphasized that nothing in the record suggested that the actuarial value of the insurance package was greater for men than for women.  See 417 U. S., at 496.  Indeed, even the exclusion of coverage for pregnancy-related disability benefited both men and women.  The Court noted that dual distribution of benefits in the now-famous lines: "The program divides potential recipients into two groups—pregnant women and nonpregnant persons. . . . The fiscal and actuarial benefits of the program thus accrue to members of both sexes."  *Id.,* at 497, n. 20.

[26] See, *e. g., Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U. S. 669, 677, n. 12 (1983) (after quoting the footnote in *Geduldig* which includes the language on which the Court relies today, we stated: "The principal emphasis in the text of the *Geduldig* opinion, unlike the quoted footnote, was on the reasonableness of the State's cost justifications for the classification in its insurance program"); *Turner* v. *Utah Dept. of Employment Security,* 423 U. S. 44, 45, n. (1975) *(per curiam)* (observing that the opinion below "ma[de] no mention of coverage limitations or insurance principles central to [*Geduldig* v.] *Aiello*"); *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 137 (1976) (relying on the reasoning of *Geduldig,* the Court again emphasized that notwithstanding a pregnancy exclusion, the plan had not been shown to provide women, as a group, with a lower level of health benefits).

[27] The abortion-funding cases cited by the Court similarly turn on the distinction between the denial of monetary benefits and the imposition of a burden.  See *Maher* v. *Roe,* 432 U. S. 464, 475 (1977) ("There is a basic

those who oppose abortion and those who physically threaten women and obstruct their access to abortion clinics is also more than semantic. Petitioners in this case form a mob that seeks to impose a burden on women by forcibly preventing the exercise of a right that only women possess. The discriminatory effect of petitioners' conduct is beyond doubt.

*Geduldig* is inapplicable for another reason. The issue of class-based animus in this case arises in a statutory, not a constitutional, context. There are powerful reasons for giving § 1985(3) a reading that is broader than the constitutional holdings on which the Court relies.[28] In our constitutional

---

difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy"); see also *Harris* v. *McRae,* 448 U. S. 297, 313–318 (1980). In *Harris* and *Maher,* the "suspect classification" that the Court considered was indigency. Relying on *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973), and *Dandridge* v. *Williams,* 397 U. S. 471 (1970), the Court rejected the argument that "financial need alone identifies a suspect class." *Maher,* 432 U. S., at 471; *Harris,* 448 U. S., at 323 (citing *Maher,* 432 U. S., at 471).

[28] A failure to meet the intent standard imposed on the Fourteenth Amendment does not preclude a finding of class-based animus here. Much of this Court's Fourteenth Amendment jurisprudence concerns the permissibility of particular legislative distinctions. The case law that has evolved focuses on how impermissible discrimination may be inferred in the face of arguably "neutral" legislation or policy. See *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S., at 274; *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 264–266 (1977); *Washington* v. *Davis,* 426 U. S. 229, 242 (1976). We have recognized that even in constitutional cases disproportionate impact may provide powerful evidence of discrimination. See *Feeney,* 442 U. S., at 279, n. 25; *Arlington Heights,* 429 U. S., at 265–266; *Davis,* 426 U. S., at 242. In developing the intent standard, though, we expressed reluctance to subject facially neutral legislation to judicial invalidation based on effect alone. The question here is not whether a law "neutral on its face and serving ends otherwise within the power of government to pursue," *Davis,* 426 U. S., at 242, violates the Equal Protection Clause. It is indisputable that a governmental body would violate the Constitution if, for the purpose of burdening abortion, it infringed a person's federally protected right to travel. *Doe* v. *Bolton,* 410 U. S. 179, 200 (1973). This governmental conduct would be

cases, we apply the intent standard to determine whether a constitutional violation has occurred. In cases under § 1985(3), we apply the class-based animus test not to determine whether a constitutional violation has occurred—the violation is independently established—but to determine whether that violation can be remedied. Given the differing roles the intent standard and the class-based animus requirement play in our jurisprudence, there is no justification for applying the same stringent standards in the context of § 1985(3) as in our constitutional cases.

As a matter of statutory interpretation, I have always believed that rules that place special burdens on pregnant women discriminate on the basis of sex, for the capacity to become pregnant is the inherited and immutable characteristic that "primarily differentiates the female from the male." *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 162 (1976) (STEVENS, J., dissenting). I continue to believe that that view should inform our construction of civil rights legislation.

That view was also the one affirmed by Congress in the Pregnancy Discrimination Act, 92 Stat. 2076, which amended Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*[29] The Act categorically expressed Congress' view that

_____

actionable under § 1 of the Ku Klux Act, now 42 U. S. C. § 1983. If private parties jointly participated in the conduct, they, too, would be liable under § 1983. See *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922 (1982); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970). The class-based animus requirement determines whether a private conspiracy to violate the federal right to travel—a right protected against private interference—similarly gives rise to a federal cause of action.

[29] The Pregnancy Discrimination Act was passed in reaction to the Court's decision in *Gilbert*, which relied on *Geduldig* to uphold a pregnancy exclusion in a private employer's disability insurance plan, challenged under Title VII. In enacting the Pregnancy Discrimination Act, Congress directly repudiated the logic and the result of *Gilbert*. See *Newport News*, 462 U. S., at 678 ("When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision").

"discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 684 (1983). *Geduldig* had held that a pregnancy-based classification did not constitute forbidden sex discrimination if the classification related to benefits and did not have a discriminatory effect. In the Pregnancy Discrimination Act, Congress rejected *Geduldig*'s focus on benefits and overall impact, instead insisting that discrimination on the basis of pregnancy necessarily constitutes prohibited sex discrimination. See H. R. Rep. No. 95–948, pp. 2–3 (1978). The statements of the bill's proponents demonstrate their disapproval of the Court's reluctance in *Gilbert* and *Geduldig* to recognize that discrimination on the basis of pregnancy is *always* gender-based discrimination. See, *e. g.*, 123 Cong. Rec. 10581 (1977) (remarks of Rep. Hawkins) ("[I]t seems only commonsense, that since only women can become pregnant, discrimination against pregnant people is necessarily discrimination against women . . .").[30]

Two Terms ago, in *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187 (1991), the Court again faced the question whether a classification based on childbearing capacity violated a statutory ban on discrimination. That case, arising under Title VII, concerned Johnson Controls' "fetal-protection policy," which excluded all women "capable of bearing children" from jobs requiring exposure to lead. Johnson Controls sought to justify the policy on the basis that maternal exposure to lead created health risks for a fetus. The first question the Court addressed was whether the policy was facially discriminatory or, alternatively, facially neutral with merely a discriminatory effect. The

---

[30] The House and Senate Reports both state that the Act adopts the position, held by the Justices who dissented in *Gilbert*, that discrimination on the basis of pregnancy is discrimination on account of sex. H. R. Rep. No. 95–948, p. 2 (1978); S. Rep. No. 95–331, pp. 2–3 (1977); see *Newport News*, 462 U. S., at 678–679.

Court concluded that the policy was facially discriminatory. The policy was not neutral, the Court held, "because it does not apply to the reproductive capacity of the company's male employees in the same way as it applies to that of the females." *Id.*, at 199. *Johnson Controls*, I had thought, signaled the Court's recognition that classifications based on ability to become pregnant are necessarily discriminatory.

## VI

Respondents' right to engage in interstate travel is inseparable from the right they seek to exercise. That right, unduly burdened and frustrated by petitioners' conspiracy, is protected by the Federal Constitution, as we recently reaffirmed in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). Almost two decades ago, the Court squarely held that the right to enter another State for the purpose of seeking abortion services available there is protected by the Privileges and Immunities Clause, U. S. Const., Art. IV, §2. *Doe* v. *Bolton*, 410 U. S. 179, 200 (1973).[31] A woman's right to engage in interstate travel for this purpose is either entitled to special respect because she is exercising a constitutional right, or because restrictive rules in her home State may make travel to another State imperative. Federal courts are uniquely situated to protect that right for the same reason they are well suited to protect the privileges and immunities of those who enter other States to ply their trade. See, *e. g.*, *Blake* v. *McClung*, 172 U. S. 239, 248–256 (1898).

---

[31] Although two Justices dissented from other portions of the decision in *Doe* v. *Bolton*, see 410 U. S., at 221–223, no Member of the Court expressed disagreement with this proposition. Moreover, even if the view of the two Justices who dissented in *Roe* v. *Wade*, 410 U. S. 113, 171, 221 (1973), were the law, a woman's right to enter another State to obtain an abortion would deserve strong protection. For under the position espoused by those dissenters, the diversity among the States in their regulation of abortion procedures would magnify the importance of unimpeded access to out-of-state facilities.

The District Court's conclusion that petitioners intended to interfere with the right to engage in interstate travel is well supported by the record. Interference with a woman's ability to visit another State to obtain an abortion is essential to petitioners' achievement of their ultimate goal—the complete elimination of abortion services throughout the United States. No lesser purpose can explain their multistate "rescue" operations.

Even in a single locality, the effect of petitioners' blockade on interstate travel is substantial. Between 20 and 30 percent of the patients at a targeted clinic in Virginia were from out of State and over half of the patients at one of the Maryland clinics were interstate travelers. 726 F. Supp., at 1489. Making their destination inaccessible to women who have engaged in interstate travel for a single purpose is unquestionably a burden on that travel. That burden was not only a foreseeable and natural consequence of the blockades, but indeed was also one of the intended consequences of petitioners' conspiracy.

Today the Court advances two separate reasons for rejecting the District Court's conclusion that petitioners deliberately deprived women seeking abortions of their right to interstate travel. First, relying on an excerpt from our opinion in *United States* v. *Guest*, 383 U. S. 745, 760 (1966), the Court assumes that " 'the predominant purpose' " or "the very purpose" of the conspiracy must be to impede interstate travel. *Ante*, at 275, 276. Second, the Court assumes that even an intentional restriction on out-of-state travel is permissible if it imposes an equal burden on intrastate travel. The first reason reflects a mistaken understanding of *Guest* and *Griffin*, and the second is unsupported by precedent or reason.

In the *Guest* case, the Court squarely held that the Federal Constitution protects the right to engage in interstate travel from private interference. Not a word in that opinion suggests that the constitutional protection is limited to impedi-

ments that discriminate against nonresidents. Instead, the Court broadly referred to the federal commerce power that "authorizes Congress to legislate for the protection of individuals from violations of civil rights that impinge on their free movement in interstate commerce." 383 U. S., at 759. It then held that the right of interstate travel was one of the federal rights protected from private interference by the criminal statute that had been enacted as § 6 of the Enforcement Act of 1870, 16 Stat. 141, later codified at 18 U. S. C. § 241. That statute had previously been construed to contain a "stringent scienter requirement" to save it from condemnation as a criminal statute failing to provide adequate notice of the proscribed conduct. 383 U. S., at 785 (Brennan, J., concurring in part and dissenting in part); see also *id.*, at 753–754. The *Guest* opinion then explained why this history would limit the coverage of 18 U. S. C. § 241:

> "This does not mean, of course, that every criminal conspiracy affecting an individual's right of free interstate passage is within the sanction of 18 U. S. C. § 241. A specific intent to interfere with the federal right must be proved, and at a trial the defendants are entitled to a jury instruction phrased in those terms. *Screws* v. *United States*, 325 U. S. 91, 106–107 [1945]. Thus, for example, a conspiracy to rob an interstate traveler would not, of itself, violate § 241. But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought." 383 U. S., at 760.

Today the Court assumes that the same sort of scienter requirement should apply to § 1985(3) because 18 U. S. C. § 241 is its "criminal counterpart." *Ante*, at 275.

The Court is mistaken. The criminal sanctions that were originally included in §2 of the Ku Klux Act were held unconstitutional over a century ago. *United States* v. *Harris,* 106 U. S. 629 (1883); *Baldwin* v. *Franks,* 120 U. S. 678 (1887). The statute now codified at 18 U. S. C. §241 was enacted in 1870, a year earlier than the Ku Klux Act. The texts of the two statutes are materially different. Even if that were not so, it would be inappropriate to assume that a strict scienter requirement in a criminal statute should be glibly incorporated in a civil statute.[32] But what is most significant is the dramatic difference between the language of 18 U. S. C. §241, which includes an unequivocal "intent" requirement and the language of §1985(3), which broadly describes a purpose to deprive another of a protected privilege "either directly or indirectly." An indirect interference with the right to travel may violate §1985(3) even if it would not violate §241.[33]

---

[32] See, *e. g., United States* v. *United States Gypsum Co.,* 438 U. S. 422, 436, and n. 13 (1978) (distinguishing intent requirement for civil and criminal violations of the Sherman Act).

[33] The Court's confusion of the intent element of §1985(3) with the intent required in criminal civil rights statutes is particularly surprising in that *Griffin* v. *Breckenridge,* 403 U. S. 88 (1971), anticipated this mistake and explicitly warned against it. Indeed, *Griffin* expressly rejected the idea that §1985(3) contained a specific intent requirement. In finding specific intent necessary for a violation of 18 U. S. C. §241, *United States* v. *Guest,* 383 U. S. 745 (1966), relied on *Screws* v. *United States,* 325 U. S. 91, 106–107 (1945), which also construed a criminal statute, 18 U. S. C. §241, to require specific intent. See *Guest,* 383 U. S., at 760. *Griffin* unmistakably distinguished that kind of specific intent requirement from the mental element required for a claim under §1985(3). In *Griffin* the Court stated that the "motivation requirement" of §1985(3) "must not be confused with the test of 'specific intent to deprive a person of a federal right made definite by decision or other rule of law' articulated by the plurality opinion in *Screws* v. *United States . . . .*" 403 U. S., at 102, n. 10. The language could hardly be more clear. *Griffin* took care to differentiate between "invidiously discriminatory animus," which §1985(3) did require, and specific intent to violate a right, which §1985(3) did not. Further, while distinguishing *Screws, Griffin* cited *Monroe* v. *Pape,* 365 U. S. 167 (1961), which declined

The Court interpreted the right to interstate travel more generously in Griffin. It wrote:

"Under these allegations it is open to the petitioners to prove at trial that they had been engaging in interstate travel or intended to do so, that their federal right to travel interstate was one of the rights meant to be dis-

---

to find a specific intent requirement for actions under 42 U. S. C. § 1983. See Monroe, 365 U. S., at 187; see also id., at 206–207 (Frankfurter, J., concurring in part and dissenting in part). Section 1983, like § 1985(3), was enacted as part of the Ku Klux Act of 1871 and provides for civil enforcement of federal rights. The pattern is clear: The criminal statutes, 18 U. S. C. § 241 and 18 U. S. C. § 242, require specific intent to violate a right; the civil statutes, 42 U. S. C. § 1983 and 42 U. S. C. § 1985(3), do not.

The Court's repeated invocation of the word "aim" simply does not support its attempt to manufacture a specific intent requirement out of whole cloth. As the Court observes, Carpenters v. Scott, 463 U. S. 825 (1983), uses the expression "aimed at," id., at 833. Carpenters does not relate this phrase to a specific intent requirement, nor does it in any other way suggest that an action under § 1985(3) requires proof of specific intent. Griffin also uses the phrase "aim at"; there, the Court states: "The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U. S., at 102 (emphasis added). Unlike Carpenters, Griffin does discuss whether § 1985(3) requires specific intent. In the footnote appended to the very sentence that contains the phrase "aim at," the Court explains: "The motivation aspect of § 1985(3) focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus." 403 U. S., at 102, n. 10. Today, in insisting that § 1985(3) requires specific intent to violate a right, the Court contradicts Griffin and finds that one of the mental elements of § 1985(3) does relate to "scienter in relation to deprivation of rights." In seeking to justify this departure from precedent, the Court describes the passage in Griffin that includes this Court's only discussion of specific intent in relation to § 1985(3) as "supremely" irrelevant, ante, at 276, n. 6. I gather this means that only the Supreme Court could find it irrelevant; lower courts have been more reluctant to ignore Griffin's plain language, see Fisher v. Shamburg, 624 F. 2d 156, 158, n. 2 (CA10 1980); Cameron v. Brock, 473 F. 2d 608, 610 (CA6 1973); Azar v. Conley, 456 F. 2d 1382, 1385–1386 (CA6 1972); Weiss v. Patrick, 453 F. Supp. 717, 723 (R. I.), aff'd, 588 F. 2d 818 (CA1 1978), cert. denied, 442 U. S. 929 (1979).

criminatorily impaired by the conspiracy, that the conspirators intended to drive out-of-state civil rights workers from the State, or that they meant to deter the petitioners from associating with such persons. This and other evidence could make it clear that the petitioners had suffered from conduct that Congress may reach under its power to protect the right of interstate travel." *Griffin*, 403 U. S., at 106.

In that paragraph the Court mentions that the plaintiffs' federal right to travel may have been "discriminatorily" impaired. The use of that word was appropriate because of the Court's earlier discussion of the importance of class-based discriminatory animus in interpreting the statute, but was entirely unnecessary in order to uphold the constitutionality of the statute as applied to conduct that "Congress may reach under its power to protect the right of interstate travel." *Ibid.* Moreover, "in the light of the evolution of decisional law," *id.*, at 95–96, in recent years, today no one could possibly question the power of Congress to prohibit private blockades of streets and highways used by interstate travelers, even if the conspirators indiscriminately interdicted both local and out-of-state travelers.

The implausibility of the Court's readings of *Griffin* and *Guest* is matched by its conclusion that a burden on interstate travel is permissible as long as an equal burden is imposed on local travelers. The Court has long recognized that a burden on interstate commerce may be invalid even if the same burden is imposed on local commerce. See *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970); *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354, n. 4 (1951); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761 (1945). The fact that an impermissible burden is most readily identified when it discriminates against nonresidents does not justify immunizing conduct that evenhandedly disrupts both local and interstate travel. The defendants in *Griffin*, for example,

could not have refuted the claim that they interfered with the right to travel by demonstrating that they indiscriminately attacked local civil rights activists as well as nonresidents.

In this case petitioners have deliberately blockaded access to the destinations sought by a class of women including both local and interstate travelers. ˙Even though petitioners may not have known *which* of the travelers had crossed the state line, petitioners unquestionably knew that many of them had. The conclusion of the District Court that petitioners "engaged in this conspiracy for the purpose, either directly or indirectly, of depriving women seeking abortions and related medical counselling services, of the right to travel," 726 F. Supp., at 1493, is abundantly supported by the record.

Discrimination is a necessary element of the class-based animus requirement, not of the abridgment of a woman's right to engage in interstate travel. Perhaps nowhere else in its opinion does the Court reject such obvious assumptions of the authors of § 1985(3). The Reconstruction Congress would have been startled, I think, to learn that § 1985(3) protected freed slaves and their supporters from Klan violence not covered by the Thirteenth Amendment only if the Klan members spared *local* African-Americans and abolitionists their wrath. And it would have been shocked to learn that its law offered relief from a Klan lynching of an out-of-state abolitionist only if the plaintiff could show that the Klan specifically intended to prevent his travel between the States. Yet these are the impossible requirements the Court imposes on a § 1985(3) plaintiff who has shown that her right to travel has been deliberately and significantly infringed. It is difficult to know whether the Court is waiting until only a few States have abortion clinics before it finds that petitioners' behavior violates the right to travel, or if it believes that petitioners could never violate that right as long as they oppose the abortion a woman seeks to obtain as well as the travel necessary to obtain it.

## VII

Respondents have unquestionably established a claim under the second clause of § 1985(3), the state hindrance provision.[34] The record amply demonstrates petitioners' successful efforts to overpower local law enforcement officers. During the "rescue" operations, the duly constituted authorities are rendered ineffective, and mob violence prevails.[35] A conspiracy that seeks by force of numbers to prevent local officials from protecting the victims' constitutional rights presents exactly the kind of pernicious combination that the second clause of § 1985(3) was designed to counteract. As we recognized in *Griffin*, the second clause of § 1985(3) explicitly concerns such interference with state officials and for that reason does not duplicate the coverage of the first clause. *Griffin*, 403 U. S., at 99.

Petitioners' conspiracy hinders the lawful authorities from protecting women's constitutionally protected right to choose whether to end their pregnancies. Though this may be a right that is protected only against state infringement, it is clear that by preventing government officials from safeguarding the exercise of that right, petitioners' conspiracy effects a deprivation redressable under § 1985(3). See *Carpenters* v. *Scott*, 463 U. S., at 830; *id.*, at 840, n. 2 (BLACKMUN, J., dissenting); see also *Great American Fed. Sav. & Loan*

---

[34] "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another . . . *for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;* . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U. S. C. § 1985(3) (emphasis added).

[35] See 726 F. Supp., at 1489–1490, and n. 4.

*Assn.* v. *Novotny,* 442 U. S., at 384 (STEVENS, J., concurring). A conspiracy that seeks to interfere with law enforcement officers' performance of their duties entails sufficient involvement with the State to implicate the federally protected right to choose an abortion and to give rise to a cause of action under § 1985(3).

We have not previously considered whether class-based animus is an element of a claim under the second clause of § 1985(3). We have, however, confronted the question whether the class-based animus requirement developed in *Griffin* should extend to another part of the Ku Klux Act, the portion now codified at § 1985(2). That provision, which generally proscribes conspiracies to interfere with federal proceedings, was enacted as part of the same paragraph of the Ku Klux Act that also contained what is now § 1985(3).[36] For that reason, in *Kush* v. *Rutledge,* 460 U. S. 719 (1983), the defendants contended that the plaintiffs had the burden of proving that the alleged conspiracy to intimidate witnesses had been motivated by the kind of class-based animus described in *Griffin.* The Court of Appeals rejected this contention. Its reasoning, which we briefly summarized in *Kush,* is highly relevant here: "Noting the Federal Government's unquestioned constitutional authority to protect the processes of its own courts, and the absence of any need to limit the first part of § 1985(2) to avoid creating a general federal tort law, the Court of Appeals declined to impose the limitation set forth in *Griffin* v. *Breckenridge.*" 460 U. S., at 723.

*Kush* suggests that *Griffin'*s strictly construed class-based animus requirement, developed for the first clause of § 1985(3), should not limit the very different second clause. We explained:

---

[36] The full text of § 2 of the 1871 Civil Rights Act, 17 Stat. 13, is quoted in the appendix to the Court's opinion in *Kush* v. *Rutledge,* 460 U. S. 719, 727–729 (1983).

"Although *Griffin* itself arose under the first clause of § 1985(3), petitioners argue that its reasoning should be applied to the remaining portions of § 1985 as well. We cannot accept that argument for three reasons. First, the scope of the *Griffin* opinion is carefully confined to 'the portion of § 1985(3) now before us,' [*Griffin*, 403 U. S.,] at 99; see also *id.*, at 102, n. 9. There is no suggestion in the opinion that its reasoning applies to any other portion of § 1985. Second, the analysis in the *Griffin* opinion relied heavily on the fact that the sponsors of the 1871 bill added the 'equal protection' language in response to objections that the 'enormous sweep of the original language' vastly extended federal authority and displaced state control over private conduct. *Id.*, at 99–100. That legislative background does not apply to the portions of the statute that prohibit interference with federal officers, federal courts, or federal elections. Third, and of greatest importance, the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute that applies to this case." 460 U. S., at 726.

It is true, of course, that the reference to "equal protection" appears in both the first and the second clauses of § 1985(3), but the potentially unlimited scope of the former is avoided by the language in the latter that confines its reach to conspiracies directed at the "constituted authorities of any State or Territory." The deliberate decision in *Griffin* that "carefully confined" its holding to "the portion of § 1985(3) now before us," coupled with the inapplicability of *Griffin's* rationale to the second clause, makes it entirely appropriate to give that clause a different and more natural construction. Limited to conspiracies that are sufficiently massive to supplant local law enforcement authorities, the second clause requires no further restriction to honor the congressional purpose of creating an effective civil rights remedy without

federalizing all tort law. The justification for a narrow reading of *Griffin*'s judicially crafted requirement of class-based animus simply does not apply to the state hindrance clause. An action under that clause entails both a violation of the victims' constitutional rights and state involvement. This situation is so far removed from the question whether facially neutral legislation constitutes a violation of the Equal Protection Clause that the strict intent standards developed in that area can have no application.

In the context of a conspiracy that hinders state officials and violates respondents' constitutional rights, class-based animus can be inferred if the conspirators' conduct burdens an activity engaged in predominantly by members of the class. Indeed, it would be faithful both to *Griffin* and to the text of the state hindrance clause to hold that the clause proscribes conspiracies to prevent local law enforcement authorities from protecting activities that are performed exclusively by members of a protected class, even if the conspirators' animus were directed at the activity rather than at the class members. Thus, even if yarmulkes, rather than Jews, were the object of the conspirators' animus, the statute would prohibit a conspiracy to hinder the constituted authorities from protecting access to a synagogue or other place of worship for persons wearing yarmulkes. Like other civil rights legislation, this statute should be broadly construed to provide federal protection against the kind of disorder and anarchy that the States are unable to control effectively.

With class-based animus understood as I have suggested, the conduct covered by the state hindrance clause would be as follows: a large-scale conspiracy that violates the victims' constitutional rights by overwhelming the local authorities and that, by its nature, victimizes predominantly members of a particular class. I doubt whether it would be possible to describe conduct closer to the core of § 1985(3)'s coverage. This account would perfectly describe the conduct of the Ku Klux Klan, the group whose activities prompted the enact-

ment of the statute. This description also applies to petitioners, who have conspired to deprive women of their constitutional right to choose an abortion by overwhelming the local police and by blockading clinics with the intended effect of preventing women from exercising a right only they possess. The state hindrance clause thus provides an independent ground for affirmance.[37]

## VIII

In sum, it is irrelevant whether the Court is correct in its assumption that "opposition to abortion" does not necessarily evidence an intent to disfavor women. Many opponents of

---

[37] As part of its crabbed interpretation of the statute, the Court asserts that the scope of the conspiracy is irrelevant in determining whether its activities can be reached by § 1985(3). See *ante*, at 283–284. This suggestion is contradicted by our prior cases, which have recognized that the magnitude of the conspiratorial undertaking may indeed be relevant in ascertaining whether conduct is actionable under § 1985(3). See *Griffin*, 403 U. S., at 98; *Collins* v. *Hardyman*, 341 U. S. 651, 661–662 (1951).

More generally, the Court's comments evidence a renunciation of the effort to construe this civil rights statute in accordance with its intended purpose. In *Griffin*, *Novotny*, and *Carpenters*, our construction of the statute was guided by our understanding of Congress' goals in enacting the Ku Klux Act. Today, the Court departs from this practice and construes § 1985(3) without reference to the "purpose, history, and common understanding of this Civil War Era statute," *Novotny*, 442 U. S., at 381 (Powell, J., concurring). This represents a sad and unjustified abandonment of a valuable interpretive tradition.

Of course, the Court does not completely reject resort to statutory purpose: The Court does rely on legislative intent in limiting the reach of the statute. The requirement of class-based animus, for example, owes as much to *Griffin*'s analysis of congressional purpose as to the text of § 1985(3). Two Terms ago I noted: "In recent years the Court has vacillated between a purely literal approach to the task of statutory interpretation and an approach that seeks guidance from historical context, legislative history, and prior cases identifying the purpose that motivated the legislation." *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 112 (1991) (dissenting opinion). Today, the Court selectively employs both approaches to give the statute its narrowest possible construction.

abortion respect both the law and the rights of others to make their own decisions on this important matter. Petitioners, however, are not mere opponents of abortion; they are defiant lawbreakers who have engaged in massive concerted conduct that is designed to prevent all women from making up their own minds about not only the issue of abortion in general, but also whether they should (or will) exercise a right that all women—and only women—possess.

Indeed, the error that infects the Court's entire opinion is the unstated and mistaken assumption that this is a case about opposition to abortion. It is not. It is a case about the exercise of federal power to control an interstate conspiracy to commit illegal acts. I have no doubt that most opponents of abortion, like most members of the citizenry at large, understand why the existence of federal jurisdiction is appropriate in a case of this kind.

The Court concludes its analysis of § 1985(3) by suggesting that a contrary interpretation would have condemned the massive "sit-ins" that were conducted to promote desegregation in the 1960's—a "wildly improbable result." See *ante*, at 282. This suggestion is profoundly misguided. It assumes that we must totally reject the class-based animus requirement to affirm the District Court, when, in fact, we need only construe that requirement to satisfy its purpose. Moreover, the demonstrations in the 1960's were motivated by a desire to extend the equal protection of the laws to all classes—not to impose burdens on any disadvantaged class. Those who engaged in the nonviolent "sit-ins" to which the Court refers were challenging "a political and economic system that had denied them the basic rights of dignity and equality that this country had fought a Civil War to secure." *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 918 (1982). The suggestion that there is an analogy between their struggle to achieve equality and these petitioners' concerted efforts to deny women equal access to a constitutionally protected privilege may have rhetorical appeal, but it is

insupportable on the record before us, and does not justify the majority's parsimonious construction of an important federal statute.[38]

I respectfully dissent.

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, dissenting.

Petitioners act in organized groups to overwhelm local police forces and physically blockade the entrances to respondents' clinics with the purpose of preventing women from exercising their legal rights. Title 42 U. S. C. § 1985(3) provides a federal remedy against private conspiracies aimed at depriving any person or class of persons of the "equal protection of the laws," or of "equal privileges and immunities under the laws." In my view, respondents' injuries and petitioners' activities fall squarely within the ambit of this statute.

I

The Reconstruction Congress enacted the Civil Rights Act of 1871, also known as the Ku Klux Act (Act), 17 Stat. 13, to combat the chaos that paralyzed the post-War South. *Wilson* v. *Garcia,* 471 U. S. 261, 276–279 (1985); *Briscoe* v. *LaHue,* 460 U. S. 325, 336–339 (1983). Section 2 of the Act extended the protection of federal courts to those who effectively were prevented from exercising their civil rights by the threat of mob violence. Although the immediate purpose of § 1985(3) was to combat animosity against blacks and

---

[38] JUSTICE KENNEDY's reminder that the Court's denial of any relief to individual respondents does not prevent their States from calling on the United States, through its Attorney General, for help, *ante,* at 287–288, is both puzzling and ironic, given the role this administration has played in this and related cases in support of Operation Rescue. See Brief for United States as *Amicus Curiae; Women's Health Care Services* v. *Operation Rescue-National,* 773 F. Supp., at 269–270; cf. Memorandum for United States as *Amicus Curiae* in *Griffin* v. *Breckenridge,* O. T. 1970, No. 144.

their supporters, *Carpenters* v. *Scott*, 463 U. S. 825, 836 (1983), the language of the Act, like that of many Reconstruction statutes, is more expansive than the historical circumstances that inspired it. The civil-remedy component of § 2, codified at 42 U. S. C. § 1985(3), speaks in general terms, and provides a federal cause of action to any person injured or deprived of a legal right by

> "two or more persons in any State or Territory [who] conspire or go in disguise on the highway or on the premises of another, [first] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or [second] for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . ."

The Court's approach to Reconstruction Era civil rights statutes has been to "accord [them] a sweep as broad as [their] language." *United States* v. *Price*, 383 U. S. 787, 801 (1966); accord, *Griffin* v. *Breckenridge*, 403 U. S. 88, 97 (1971); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 437 (1968). Today, the Court does just the opposite, precluding application of the statute to a situation that its language clearly covers. There is no dispute that petitioners have "conspired" through their concerted and unlawful activities. The record shows that petitioners' "purpose" is "directly" to "depriv[e]" women of their ability to obtain the clinics' services, see *National Organization for Women* v. *Operation Rescue*, 726 F. Supp. 1483, 1488 (ED Va. 1989), as well as "indirectly" to infringe on their constitutional privilege to travel interstate in seeking those services, *id.*, at 1489. The record also shows that petitioners accomplish their goals by purposefully "preventing or hindering" local law enforcement authorities from maintaining open access to the clinics.

See *ibid.*, and n. 4. In sum, petitioners' activities fit precisely within the language of both clauses of § 1985(3).

Yet the Court holds otherwise, and it does so primarily on the basis of an "element" of the § 1985(3) cause of action that does not appear on the face of the statute. Adhering adamantly to our choice of words in *Griffin* v. *Breckenridge, supra,* the Court holds that petitioners did not exhibit a "class-based, invidiously discriminatory animus" against the clinics or the women they serve. I would not parse *Griffin* so finely as to focus on that phrase to the exclusion of our reasons for adopting it as an element of a § 1985(3) civil action.

### A

As the Court explained in *Griffin*, § 1985(3)'s "class-based animus" requirement is derived from the statute's legislative history. That case recounted that § 2 of the original Civil Rights bill had proposed criminal punishment for private individuals who conspired "with intent 'to do any act in violation of the rights, privileges, or immunities of another person.'" 403 U. S., at 99–100 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871)). The bill was amended to placate those who believed the proposed language was too sweeping. 403 U. S., at 100. Accordingly, the amendment narrowed the criminal provision to reach only conspiracies that deprived "any person or class of persons of the *equal* protection of the laws, or of *equal* privileges and immunities under the laws. . . ." Cong. Globe, 42d Cong., 1st Sess., at 477 (emphasis supplied). The amendment also added a civil remedy for those harmed by such conspiracies, which is now codified at § 1985(3). Looking to the "congressional purpose" the statute's legislative history exhibited, the Court concluded that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin*, 403 U. S., at 102 (footnotes omitted).

*Griffin*'s narrowing construction of § 1985(3) was a rational effort to honor the language of the statute without providing a federal cause of action for "all tortious, conspiratorial interferences with the rights of others." *Id.*, at 101. The "class-based animus" requirement avoids the constitutional difficulties of federalizing every crime or tort committed by two or more persons, while giving effect to the enacting Congress' condemnation of private action against individuals on account of their group affiliation. Perhaps the clearest expression of this intent is found in the statement of Senator Edmunds, who managed the bill on the floor of the Senate, when he explained to his colleagues that Congress did not "undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud . . . [but, if] it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, . . . then this section could reach it." Cong. Globe, 42d Cong., 1st Sess., at 567. Indeed, Senator Edmunds' comment on the scope of § 2 of the Act is illustrative of a more general concern in the 42d Congress for extending federal protection to diverse classes nationwide. See, *e. g., id.*, at App. 153–154 (Rep. Garfield) (legislation protects "particular classes of citizens" and "certain classes of individuals"); *id.*, at App. 267 (Rep. Barry) ("white or black, native or adopted citizens"); *id.*, at App. 376 (Rep. Lowe) ("all classes in all States; to persons of every complexion and of whatever politics"); *id.*, at App. 190 (Rep. Buckley) ("yes, even women").

*Griffin*'s requirement of class-based animus is a reasonable shorthand description of the type of actions the 42d Congress was attempting to address. Beginning with *Carpenters* v. *Scott*, 463 U. S. 825 (1983), however, that shorthand description began to take on a life of its own. In that case, a majority of the Court held that conspiracies motivated by bias toward others on account of their economic views or activities

did not constitute class-based discrimination within the reach of the statute. *Id.*, at 837–839. I agreed with the dissent, however, that "[i]nstead of contemplating a list of actionable class traits, . . . Congress had in mind a functional definition of the scope of [§ 1985(3)]," and intended to "provide a federal remedy for all classes that seek to exercise their legal rights in unprotected circumstances similar to those of the victims of Klan violence." *Id.*, at 851 (opinion of BLACKMUN, J.) (emphasis deleted). Accordingly, I would have found that § 1985(3) provided a remedy to nonunion employees injured by mob violence in a "self-professed union town" whose residents resented nonunion activities. *Id.*, at 854.

For the same reason, I would find in this case that the statute covers petitioners' conspiracy against the clinics and their clients. Like the Klan conspiracies Congress tried to reach in enacting § 1985(3), "[p]etitioners intended to hinder a particular group in the exercise of their legal rights because of their membership in a specific class." *Ibid.* The controversy associated with the exercise of those rights, although legitimate, makes the clinics and the women they serve especially vulnerable to the threat of mob violence. The women seeking the clinics' services are not simply "the group of victims of the tortious action," *id.*, at 850; as was the case in *Carpenters*, petitioners' intended targets are clearly identifiable—by virtue of their affiliation and activities—before any tortious action occurs.

## B

Even if I had not dissented in *Carpenters*, I would still find in today's case that § 1985(3) reaches conspiracies targeted at a gender-based class and that petitioners' actions fall within that category. I agree with JUSTICE STEVENS that "[t]he text of the statute provides no basis for excluding from its coverage any cognizable class of persons who are entitled to the equal protection of the laws." *Ante*, at 319 (dissenting

opinion). At the very least, the classes protected by § 1985(3) must encompass those classifications that we have determined merit a heightened scrutiny of state action under the Equal Protection Clause of the Fourteenth Amendment. Classifications based on gender fall within that narrow category of protected classes. *E. g., Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718, 723–726 (1982); *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). Not surprisingly, the seven Federal Courts of Appeals to have addressed the question have all reached the conclusion that the class of "women" falls within the protection of the statute. *Stathos* v. *Bowden,* 728 F. 2d 15, 20 (CA1 1984); *New York State National Organization for Women* v. *Terry,* 886 F. 2d 1339, 1359 (CA2 1989), cert. denied, 495 U. S. 947 (1990); *Novotny* v. *Great American Fed. Sav. & Loan Assn.,* 584 F. 2d 1235, 1244 (CA3 1978) (en banc), vacated on other grounds, 442 U. S. 366 (1979); *National Organization for Women* v. *Operation Rescue,* 914 F. 2d 582, 585 (CA4 1990); *Volk* v. *Coler,* 845 F. 2d 1422, 1434 (CA7 1988); *Conroy* v. *Conroy,* 575 F. 2d 175, 177 (CA8 1978); *Life Ins. Co. of North America* v. *Reichardt,* 591 F. 2d 499, 505 (CA9 1979). As JUSTICE WHITE has observed: "It is clear that sex discrimination may be sufficiently invidious to come within the prohibition of § 1985(3)." *Great American Fed. Sav. & Loan Assn.* v. *Novotny,* 442 U. S. 366, 389, n. 6 (1979) (dissenting opinion).

If women are a protected class under § 1985(3), and I think they are, then the statute must reach conspiracies whose motivation is directly related to characteristics unique to that class. The victims of petitioners' tortious actions are linked by their ability to become pregnant and by their ability to terminate their pregnancies, characteristics unique to the class of women. Petitioners' activities are directly related to those class characteristics and therefore, I believe, are appropriately described as class based within the meaning of our holding in *Griffin.*

Petitioners assert that, even if their activities are class based, they are not motivated by any *discriminatory* animus but only by their profound opposition to the practice of abortion. I do not doubt the sincerity of that opposition. But in assessing the motivation behind petitioners' actions, the sincerity of their opposition cannot surmount the manner in which they have chosen to express it. Petitioners are free to express their views in a variety of ways, including lobbying, counseling, and disseminating information. Instead, they have chosen to target women seeking abortions and to prevent them from exercising their equal rights under law. Even without relying on the federally protected right to abortion, petitioners' activities infringe on a number of state-protected interests, including the state laws that make abortion legal, Va. Code Ann. §§ 18.2–72, 18.2–73 (1988), and the state laws that protect against force, intimidation, and violence, *e. g.*, Va. Code Ann. § 18.2–119 (Supp. 1992) (trespassing), § 18.2–120 (1988) (instigating trespass to prevent the rendering of services to persons lawfully on the premises), § 18.2–404 (obstructing free passage of others), § 18.2–499 (conspiring to injure another in his business or profession). It is undeniably petitioners' purpose to target a protected class, on account of their class characteristics, and to prevent them from the equal enjoyment of these personal and property rights under law. The element of class-based discrimination that *Griffin* read into § 1985(3) should require no further showing.

I cannot agree with the Court that the use of unlawful means to achieve one's goal "is not relevant to [the] discussion of animus." *Ante*, at 274. To the contrary, the deliberate decision to isolate members of a vulnerable group and physically prevent them from conducting legitimate activities cannot be irrelevant in assessing motivation. Cf. *Maher* v. *Roe*, 432 U. S. 464, 475 (1977) (noting the "basic difference," in constitutional equal protection analysis, between "direct . . . interference with a protected activity" and "encouragement

of an alternative activity"). The clinics at issue are lawful operations; the women who seek their services do so lawfully. In my opinion, petitioners' unlawful conspiracy to prevent the clinics from serving those women, who are targeted by petitioners by virtue of their class characteristics, is a group-based, private deprivation of the "equal protection of the laws" within the reach of § 1985(3).

The Court finds an absence of discriminatory animus by reference to our decisions construing the scope of the Equal Protection Clause, and reinforces its conclusion by recourse to the dictionary definition of the word "invidious." See *ante*, at 271–274. The first step would be fitting if respondents were challenging state action; they do not. The second would be proper if the word "invidious" appeared in the statute we are construing; it does not. As noted above, *Griffin's* requirement of "class-based, invidiously discriminatory animus" was a shorthand description of the congressional purpose behind the legislation that became § 1985(3). Microscopic examination of the language we chose in *Griffin* should not now substitute for giving effect to Congress' intent in enacting the relevant legislative language, *i. e.*, that "any violation of the right, the *animus* and effect of which is to strike down the citizen, to the end that he [or she] may not enjoy equality of rights as contrasted with . . . other citizens' rights, shall be within the scope of the remedies of this section." Cong. Globe, 42d Cong., 1st Sess., at 478 (Rep. Shellabarger).

Because § 1985(3) is a statute that was designed to address deprivations caused by *private* actors, the Court's invocation of our cases construing the reach of the Equal Protection Clause of the Fourteenth Amendment is misplaced. The Court relies on *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), in which we maintained that, for purposes of the Fourteenth Amendment, "not . . . every legislative classification concerning pregnancy is a sex-based classification." *Id.*, at 496, n. 20. But that case construed a constitutional provision

governing state action, which is far different than determining the scope of a statute aimed at rectifying harms inflicted by private actors. In fact, in stark contrast to our constitutional holding in *Geduldig,* Congress has declared that, for purposes of interpreting a more recent antidiscrimination statute, a classification based on pregnancy is considered a classification "on the basis of sex." See Pregnancy Discrimination Act, 92 Stat. 2076, 42 U. S. C. § 2000e(k); *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U. S. 669, 678 (1983). Similarly, although we have determined that a successful constitutional challenge to a regulation that disproportionately affects women must show that the legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279 (1979), Congress recently has made clear its position that showing subjective intent to discriminate is not always necessary to prove statutory discrimination, see Civil Rights Act of 1991, § 105(a), 105 Stat. 1074.

In today's case, I see no reason to hold a § 1985(3) plaintiff to the constitutional standard of invidious discrimination that we have employed in our Fourteenth Amendment jurisprudence. To be sure, the language of that Amendment's Equal Protection Clause and § 1985(3) are similar, and "[a] century of Fourteenth Amendment adjudication has . . . made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons." *Griffin,* 403 U. S., at 97. The Court resolves that difficulty by construing the two provisions in tandem, although there surely is no requirement that we do so. Cf. *Romero* v. *International Terminal Operating Co.,* 358 U. S. 354, 378–379 (1959) (explaining that statutory grant of "arising under" jurisdiction need not mirror the reach of Art. III "arising under" jurisdiction).

I would focus not on the similarities of the two provisions, but on their differences. The Equal Protection Clause guarantees that no State shall *"deny* to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, § 1 (emphasis added). In my view, § 1985(3) does not simply repeat that guarantee, but provides a complement to it: No private actor may conspire with the purpose of *"depriving* . . . any person or class of persons of the equal protection of the laws." (Emphasis added.) Unlike "deny," which connotes a withholding, the word "deprive" indicates an intent to prevent private actors from taking away what the State has seen fit to bestow.

The distinction in choice of words is significant in light of the interrelated objectives of the two provisions. The Fourteenth Amendment protects against state action, but it "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948). Section 1985(3), by contrast, was "meant to reach private action." *Griffin, supra,* at 101. Given that difference in focus, I would not interpret "discriminatory animus" under the statute to establish the same high threshold that must be met before this Court will find that a State has engaged in invidious discrimination in violation of the Constitution. As the 42d Congress well appreciated, private actors acting in groups can be as devastating to the exercise of civil rights as hostile state actors, and they pose an even greater danger because they operate in an unregulated realm divorced from the responsibilities and checking functions of government. In recognition of that danger, I would hold that *Griffin*'s element of class-based discrimination is met whenever private conspirators target their actions at members of a protected class, by virtue of their class characteristics, and deprive them of their equal enjoyment of the rights accorded them under law.

This case is not about abortion. It most assuredly is not about "the disfavoring of abortions" by state legislatures.

*Ante,* at 273 (discussing *Maher* v. *Roe,* 432 U. S. 464 (1977); *Harris* v. *McRae,* 448 U. S. 297 (1980)). Rather, this case is about whether a private conspiracy to deprive members of a protected class of legally protected interests gives rise to a federal cause of action. In my view, it does, because that is precisely the sort of conduct that the 42d Congress sought to address in the legislation now codified at § 1985(3). Our precedents construing the scope of gender discrimination under the Fourteenth Amendment should not distract us from properly interpreting the scope of the statutory remedy.

## II

The second reason the majority offers for reversing the decision below is that petitioners' activities did not intentionally deprive the clinics and their clients of a right guaranteed against private impairment, a requirement that the Court previously has grafted onto the *first* clause of § 1985(3). See *Carpenters,* 463 U. S., at 833. I find it unnecessary to address the merits of this argument, however, as I am content to rest my analysis solely on the basis that respondents are entitled to invoke the protections of a federal court under the *second* clause of § 1985(3). Whereas the first clause of the statute speaks of conspiracies whose purpose is to "depriv[e], either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," the second clause addresses conspiracies aimed at "preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."

Respondents attempted to brief the issue for the Court in a supplemental brief on reargument, but the effort was rejected by a majority of the Court. See 505 U. S. 1240 (1992). Although the issue is open to be decided on remand, I agree with JUSTICE STEVENS that "[r]espondents have unquestionably established a claim under the second clause of § 1985(3),

the state hindrance provision." *Ante,* at 339 (dissenting opinion). We have not previously had occasion to consider the scope of the statute's "prevention or hindrance" provision, but it is clear that the second clause does not require that actionable conspiracies be "aimed at interfering with rights" that are "protected against private, as well as official, encroachment." *Carpenters, supra,* at 833. Rather, it covers conspiracies aimed at obstructing local law enforcement. See *Griffin,* 403 U. S., at 98–99 (second clause of § 1985(3) prohibits "interference with state officials"); *Great American Fed. Sav. & Loan Assn.* v. *Novotny,* 442 U. S., at 384 (STEVENS, J., concurring). Like JUSTICE STEVENS, I am satisfied by my review of the record that the District Court made findings that adequately support a conclusion that petitioners' activities are class based and intentionally designed to impede local law enforcement from securing "the equal protection of the laws" to the clinics and the women they serve. See 726 F. Supp., at 1489, and n. 4, and 1496.

## III

In *Griffin,* this Court "resurrect[ed]" § 1985(3) "from its interment under *Collins* v. *Hardyman,* 341 U. S. 651 (1951)," to hold that the statute provided a federal remedy for those injured by purely private conspiracies. *Novotny, supra,* at 395, n. 19 (WHITE, J., dissenting). That resurrection proved a false hope indeed. The statute was intended to provide a federal means of redress to the targets of private conspiracies seeking to accomplish their political and social goals through unlawful means. Today the Court takes yet another step in restricting the scope of the statute, to the point where it now cannot be applied to a modern-day paradigm of the situation the statute was meant to address. I respectfully dissent.